## IN THE COURT OF APPEALS OF TENNESSEE, WESTERN SECTION
## AT NASHVILLE
_____

|  |  |  |
|---|---|---|
| **WILLIAM PATRICK VARLEY, JR. ,** | ) | Davidson County Circuit Court |
|  | ) | No. 94D-2015 |
| Plaintiff/Appellee. | ) |  |
|  | ) |  |
| VS. | ) | C. A. No. 01A01-9511-CV-00498 |
|  | ) |  |
| **PAMELA DAWN VARLEY,** | ) |  |
|  | ) |  |
| Defendant/Appellant. | ) |  |
|  | ) |  |

_____

From the Circuit Court of Davidson County at Nashville.
**Honorable Muriel Robinson, Judge**

**Robert Todd Jackson**, Nashville, Tennessee
**Robert L. Jackson**, Nashville, Tennessee
Attorneys for Defendant/Appellant.

**Mary Arline Evans**, Nashville, Tennessee
Attorney for Plaitniff/Appellee.

OPINION FILED:

**REVERSED IN PART AND AFFIRMED IN PART**

**FARMER, J.**

**CRAWFORD, P.J., W.S.** : (Concurs)
**HIGHERS, J.** : (Concurs)

This is a divorce action wherein the appellant, Pamela Dawn Varley (Wife), appeals from the final decree which awarded a divorce and sole custody of the parties' three minor children to Appellee, William Patrick Varley, Jr. (Husband). The children are Bridget Marie, born December 14, 1988, William Patrick Varley, III, born January 23, 1991 and Sadie Ellen Varley, whose date of birth is June 30, 1992. The decree also fails to award Wife alimony.

The parties married in July 1988 and separated in April 1994. The month following, Husband filed his complaint seeking a divorce on grounds of inappropriate marital conduct or, in the event the parties entered into a marital dissolution agreement, irreconcilable differences. Wife counterclaimed for divorce on the same grounds and sought an award of permanent alimony. Both parties sought sole custody of the children. In a subsequent hearing on various motions filed by the parties, the trial court held Wife in direct contempt of court "for an incident in the hallway immediately following the hearing" and ordered that she be punished by "tak[ing] a tour of the jail facilities, immediately."

The final hearing occurred on April 25-26, 1995 and adduced the following evidence: At the time of the hearing, Husband was 42 and Wife, 30. Husband is a certified public accountant in private practice. In 1994, he earned an adjusted gross income of approximately $40,000, with a net monthly income of approximately $2,950. His hours of employ are from approximately 8:30 a.m. to 6:30 p.m. and he works some weekends. Wife is a high school graduate with 3 years of college. She would like to obtain a teaching certificate which will require two years of additional study. Wife currently works at a parochial early education facility teaching computer and supervising four and five year old children. Wife's mother has been the director of the program for the past fifteen years. Wife's annual net earnings are approximately $7,000 based on part-time employment.

Prior to the marriage, in 1986, Husband purchased a home at 801 Kendall Drive which became the parties' marital residence. From January 1989 to July 1990, Husband worked at home out of an office in the garage. Husband testified that from July through October 1990, his work necessitated out-of-town travel. He and a partner had purchased a trucking line in Little Rock, Arkansas. The business was purchased two days prior to the invasion of Kuwait and experienced

financial difficulties when "fuel prices went through the ceiling." The business eventually went bankrupt, with Husband's partner also taking a personal bankruptcy. Husband, however, is still attempting to settle some of the outstanding debts. Husband stated that during this time period, he was away from home during the week, returning on the weekends. The business was then moved to Gordonsville, Tennessee where Husband worked from November of 1990 to July 1991. According to Husband, the move allowed him "normal work hours" and to come home everyday. Wife complained that during this time, Husband was not there for her "mentally, physically, financially."

Wife testified that problems arose for the couple soon after the birth of their first child. During the marriage, Wife had no checking account or credit card and Husband was responsible for paying the bills. After Bridget's birth, Husband gave Wife $40 per week for living expenses, increased to $60 when William was born and, finally, to $100 when the youngest child was born.

Much of the testimony centered around Wife's admission of an extra-marital affair with Mr. Paul Ligon. Ligon is a neighbor of the parties, residing at 805 Kendall Drive since 1992. Initially, Ligon became acquainted with both parties, watching ball games with Husband at the Varley residence and playing with the Varley children. Husband testified that in April 1994, he received a phone call late one evening from his brother-in-law (husband to Mrs. Varley's twin sister, Pat) and was informed that "[Wife] was out with Paul Ligon." Husband stated that he confronted Wife with this information on her return home and she denied any misconduct. According to Husband, from that night forward he and Wife slept in different rooms and their relationship further changed. He explained: "[s]he started going out just about every night, becoming, . . . belligerent, obstinate. Just wouldn't have much to do with me." Husband complained that during this time Wife would stay out late at night, 4 or 5 nights a week. Sometimes she took the children with her, keeping them out until 10 or 11 p.m.

Husband also complained that Wife has attempted to alienate the affections of his children from him. He stated that they are encouraged that "Dad's bad." He related a September 9, 1994 incident wherein, after their appearance in court on a preliminary matter which, as heretofore noted, resulted in Wife's being held in contempt, he returned home to find Wife and various of her

family members present. Husband described their behavior as "taunting" and "obnoxious" and he requested that they leave. Wife denied this type behavior by herself or her family members. When they refused to leave, Husband called the police. According to Husband, Bridget began kicking him and "looking for applause from the relatives." Wife's mother described the incident by stating, "I saw . . . William and Sadie, get . . . one of them got [a] bat, the other got a stick and went up, trying to hit their father. And they were saying, leave my mother alone."

Husband believes Wife has taught the children to lie for her. He claimed that "[Wife] tells [the children] to kick me, hit me" and she, then, cheers them on. He believes Wife promotes hostility toward him and his family. He further proclaimed that Wife had stated in the presence of the children that Ligon would be a better father.

Husband believes himself the better custodial parent, declaring: "I'm more honest. I think I have . . . better moral values. I'm more mature. I'm more dependable. I think that I will [give] the children a better chance at success in life, whether it be college or whatever. . . . I think I'm a better role model. . . . I'm . . . more secure and stable."

Husband stated that he lived alone 11 years prior to his marriage and has sufficient skills to care for and nurture the children. Husband's mother testified that she will assist Husband in the care of the children, if he is awarded custody. Husband described his mother as "the main baby-sitter, prior to the divorce."

The proof shows that the eldest child is in kindergarten at St. Ann's and the younger children are enrolled at the day care facility where Wife is employed. If awarded custody, Husband plans to enroll the younger children at St. Mary's, which is in close proximity (less than a mile) to both the marital residence and Husband's office. Husband or his mother would pick up Bridget after school. After school day care is also available at St. Mary's. During the summer months, Bridget would stay with her grandmother and the younger ones, at St. Mary's. On cross examination, Husband stated that he had no problems with the care his younger children were receiving at their present day care facility. He believes that Wife and children love each other.

Both Ligon and Wife testified that their sexual relationship began in July 1994. Wife was competing in a triathalon in Mississippi and Ligon accompanied her, resulting in their sexual encounter. Their last sexual encounter was in February 1995. Ligon testified that on a couple of occasions between September and December 1994, he met with Wife on late evenings after the children's bedtime. Ligon also stated that during the summer of 1994, he and Wife would sit out in the driveway talking until late at night. Ligon stated that in April 1994 he and Wife, her sister and another friend went out together playing darts and drinking "a couple of beers." Ligon testified that prior thereto, he and his parents, with whom he resides, had socialized with the Varleys. Ligon confirmed that he had "read" for Bridget's class at school. His testimony further revealed that the Varley children frequently visit the Ligon residence and, in fact, were there as recent as the day prior to Ligon's testimony. Wife's sister testified that she had observed the Varley children with Wife and Ligon "[v]isiting in the yard, children playing."

Wife testified that her travel to Mississippi to compete in the triathalon occurred just a couple of days after Bridget had broken her arm while playing. Wife explained that she decided to make the trip only after Husband's assurances that Bridget would be fine. The children stayed with their father at this time. Wife stated that she departed later than originally intended (due to Bridget's condition) and after Bridget had received medical attention.

When asked, "[d]id [Husband] ever complain to you about the time you were spending with [Ligon]?", Wife replied that prior to his filing for divorce, she "confronted him . . . about [if] it made him uncomfortable that Paul was at the house, or if he came home from work and Paul was outside the house, if there was any discomfort there, to please tell me. And he said no, . . . that was not a problem." Wife admitted that "a couple of times" during the summer of 1994 she went out at night after the children were asleep to meet Ligon. She said that she usually did not leave the house without first putting the children to bed and having "everything ready for the next day." She denied any romantic activity with Ligon in the presence of the children.

On cross-examination, Wife denied encouraging the children to disrespect their father, commenting: "I respect [Husband] as their father. I want them to see him as their father, and have a good relationship with him." She admitted, however, that for Christmas 1994, she purchased

gifts for the children to give Mr. Ligon, but none for their father. Gifts were also exchanged between her and the children and various other neighbors. Wife stated that she had enough money to purchase a gift for their father and "[i]f the children asked me to do that, I would have done that." Wife believes the children love their father, but described his behavior toward them as "distant."

Wife testified that she was primarily responsible for the children's care during the marriage (packing their lunches, bathing them and putting them to bed). Wife has coordinated her schedule at work to allow her to take Bridget to and from school. She is currently the "room mother" for Bridget's classroom. Wife stated that her children and her weight are most important to her. If awarded custody, but not the marital residence, Wife plans to move into the downstairs portion of her parents' home. Wife's mother testified that she and her husband would be willing to financially assist Wife in obtaining an apartment.

Various other family members and co-workers of Wife testified that Wife is a loving and caring mother. Bridget's teacher at St. Ann's, Tammy Tiege, testified that Bridget is a very good student and that both parents were present for a parent-teacher conference.

Husband's mother, Ellen Varley, testified that Husband's 39 year old brother, John, has resided with her for the past ten years. She admitted that John had been convicted of DUI, but denied that he had a drinking problem. He drinks in her home when the Varley children are present; however, he does not take the children places.

After hearing the evidence, the trial court granted Husband an absolute divorce "due to . . . Wife's marital misconduct, in view of her admitted adultery and her continuing relationship with [Ligon] through the course of the separation." The court awarded the marital residence to Husband "subject to all debt and tax liens" and ordered Husband to pay all debts incurred by the parties "up to April 26, 1995." Husband was also ordered to purchase a vehicle for Wife for an amount not to exceed $13,000 and pay for the children's health insurance. As to the issue of child custody, the court found:

[T]hat both parties have adequate parenting skills and that both had

primarily done a very good job caring for the children. The Court finds that there is a difference in the emotional and moral stability of both parents and finds that the Wife is the volatile party and that the Husband is very passive. The Court declares that the Wife is not a credible witness in some regards as to her relationship with Mr. Ligon. The Court finds that it is in the best interest of the three (3) minor children that their custody be awarded to the Husband.

Wife was awarded visitation and an extended summer visitation from June 15 to August 15. Child support was awarded as follows:

> The Court further finds that due to the present financial situation of the Wife, the Court should deviate from the Child Support Guidelines and set no child support for a period of one (1) year. The Court finds that the Wife makes Seven Thousand ($7,000.00) Dollars per year and that she is able-bodied and has the earning capacity to support herself, and that she plans to go to school, and that she has the ability to increase her income. . . . The Court further finds that for the month of June each year, the Husband should pay child support to the Wife in the sum of Four Hundred Fifty ($450.00) Dollars, that he should pay child support in the amount of Nine Hundred ($900.00) Dollars for the month of July, and child support in the amount of Four Hundred Fifty ($450.00) Dollars for the month of August each year.

The court expressly enjoined Wife "from attempting to alienate the affections of the minor children from their father or his family" and "from having the minor children . . . around Mr. Ligon or any other romantic interest in an inappropriate circumstance."

> Wife frames the issues on appeal as follows:

> 1. Whether the Trial Court erred in awarding custody of the parties' three children to the Appellee/Husband, when it appears from the record that the Trial Court had made its decision with regard to placement of custody during the first witness's (the Appellee) testimony, and whether the Court should have disqualified itself from the final hearing, and if not, whether or not, on a comparative fitness test, it would have been in the best interest and welfare of the minor children that their custody be awarded to the Appellant.

> 2. Whether the Trial Court erred in not awarding the Appellant any rehabilitative alimony, despite finding that the Appellant was economically disadvantaged in her financial situation, as compared to the Appellee.

> 3. Whether the Trial Court erred in not finding the Appellee guilty of fault during the marriage, thus awarding the divorce to the parties, as opposed to the Appellee, when the adultery and

misconduct found by the Trial Court occurred after filing, and there was no Amended Complaint filed by Appellee to charge adultery or to bring his grounds for divorce current through the final hearing.

4. Whether the finding of direct contempt of Court against the Wife should be vacated wherein the alleged contempt did not occur in the direct presence of the Court, (it being in the hallway), and the Appellant's rights to notice and opportunity to be heard under direct contempt were violated.

Husband presents this additional issue:

Whether or not the trial court erred in failing to order the Wife to pay child support to the Husband for the care and maintenance of the three minor children of the parties.

We deal first with the issue of whether the trial court's judgment holding Wife in direct contempt should be vacated by this Court. It is Wife's position that the contempt, if any, was indirect and therefore punishable only after notice and an opportunity to be heard. She relies upon the express language of the trial court's judgment, holding Wife in "direct" contempt "for an incident in the hallway immediately following the hearing of this cause . . . ." Wife contends that a finding of direct contempt must be based upon conduct actually committed in the court's presence and since the trial court was obviously not in the hallway, her contempt, if any, was not subject to summary disposition.

We first distinguish between criminal and civil contempt as the trial court's judgment was not specific. The former is punitive in nature and its purpose is to vindicate the authority of the law and the court as an organ of society. The latter is necessary to compel obedience with an intentionally disobeyed court order. In this case, it is said that "the contemnor 'carries the keys to the jail in his or her own pocket.'" *Crabtree v. Crabtree*, 716 S.W.2d 923, 925 (Tenn. App. 1986).

It is clear from the record that the contempt in which Wife was held is "criminal." Rule 42 T.R.A.P., as here pertinent, provides:

**(a) Summary Disposition**. A criminal contempt may be punished summarily if the judge certifies that he or she saw or heard the conduct constituting the contempt and that it was committed in

the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

(b) **Disposition Upon Notice and Hearing**. A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice.

We note that this Court is at somewhat of a disadvantage because the record never specifies the conduct on which the finding of contempt is based. Moreover, and most importantly, the record contains no certification that the judge saw or heard the conduct constituting the contempt or that it was committed in the actual presence of the court, as is necessary under the rule. Consequently, we hold the record insufficient to support the trial court's finding of direct contempt. The judgment of the trial court in this regard is, therefore, vacated.

We next consider whether the divorce should have been properly awarded to both parties. As noted, the trial court awarded an absolute divorce to Husband due to "Wife's marital misconduct, in view of her admitted adultery and her continuing relationship with [Ligon] through the course of the separation." Wife argues on appeal that Husband's complaint for divorce alleged as grounds irreconcilable differences and inappropriate marital conduct only and at no time was the pleading amended to allege adultery, nor a motion made to amend the pleading to conform to the evidence.

It is not disputed that Husband's complaint omits the specific allegation of adultery and at no time was the pleading ever expressly amended. Both parties call our attention to Rule 15.02 T.R.C.P., which provides, in part pertinent:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

Contrary to Husband, Wife argues that the issue was not tried by consent and that Husband's failure to amend the pleadings prohibits the trial court's reliance on such ground as a

basis for awarding Husband the divorce. We find most revealing the assertion, in Wife's brief, that "Appellant's counsel for appeal cannot understand why the counsel for the Appellant at the trial did not object [to the issue being tried]." Wife continues that she "still cannot agree that the issue or grounds found by the Trial Court were tried by her express or implied consent. . . ." Indeed, the record does not reflect any objection by Wife to the trial of the issue at any time throughout the course of the proceedings.[1] We conclude that the issue of adultery was clearly tried by the implied consent of the parties and properly before the trial court for consideration.

Further, we find no error by the trial court in its construction or application of T.C.A. § 36-4-129(b), as contended by Wife. The statute reads:

> The court may, upon such stipulations or upon proof, grant a divorce to the party who was less at fault or, if either or both parties are entitled to a divorce, declare the parties to be divorced, rather than awarding a divorce to either party alone.

Wife asserts that the trial court erred in awarding the divorce to Husband "alone" and, in accordance with the statute, should have found Husband guilty of fault, determined which of the parties was less at fault and then awarded the divorce accordingly, "giving an indication in the record and its [o]rder" of which party was less at fault.

We do not find Wife's interpretation of the foregoing statute accurate. Although the statute allows for the awarding of the divorce to the party "less at fault," there is certainly no requirement of a written finding by the trial court that both parties were at fault or which party was less at fault. This is implicit within the trial court's ruling awarding the divorce to Husband. Moreover, subsection (b) expressly acknowledges the awarding of a divorce "to either party alone." As we have determined that the issue of adultery was proper for the trial court's consideration, we find no error in its failure to award a divorce to both parties; the facts do not preponderate against the trial court's findings in this regard. *See* Rule 13(d) T.R.A.P. This issue is without merit.

---

[1]From review of the trial transcript, we believe Wife's counsel at trial mistakenly thought that the allegation of adultery was within the complaint as counsel on more than one occasion makes reference thereto.

We now turn attention to the premier issue of child custody. We are guided in our review by this Court's holding in *Koch v. Koch*, 874 S.W.2d 571 (Tenn. App. 1993), wherein it was announced:

> Trial courts are vested with wide discretion in matters of child custody and the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion. *Mimms v. Mimms*, 780 S.W.2d 739 (Tenn.App.1989). In custody cases, the welfare and best interest of a child are of paramount concern. A determination of a child's best interests must turn on the particular facts of each case. *Scarbrough v. Scarbrough*, 752 S.W.2d 94 (Tenn.App.1988). In *Bah v. Bah*, 668 S.W.2d 663 (Tenn.App.1983) the court said:
>
> > We adopt what we believe is a common sense approach to custody, one which we will call the doctrine of "comparative fitness." The paramount concern in child custody cases is the welfare and best interest of the child. *Mollish v. Mollish*, 494 S.W.2d 145, 151 (Tenn.App.1972). There are literally thousands of things that must be taken into consideration in the lives of young children, *Smith v. Smith*, 188 Tenn. 430, 437, 220 S.W.2d 627, 630 (1949), and these factors must be reviewed on a comparative approach:
> >
> > > Fitness for custodial responsibilities is *largely a comparative matter*. No human being is deemed perfect, hence no human can be deemed a perfectly fit custodian. Necessarily, therefore, the courts must determine which of two or more available custodians is more or less fit than others.
> >
> > *Edwards v. Edwards*, 501 S.W.2d 283, 290-91 (Tenn.App.1973) (emphasis supplied).

*Koch*, 874 S.W.2d at 575.

The court in *Bah* identified certain factors as relevant for consideration when making an award of custody to include the age, habits, mental and emotional make-up of the child and the parties seeking custody; the education and experience of those desiring custody; their character and propensities as evidenced by their past conduct; the financial and physical circumstances available in the home of each party wanting custody; the availability and extent of third party support; the associations and influences to which the child is most likely to be exposed; and where exists the greater likelihood of an environment for the child of love, warmth, stability, support, consistency,

care and concern and physical and spiritual nurture. ***Bah v. Bah***, 668 S.W.2d 663, 666 (Tenn. App. 1983).[2] Finally, as these children are of "tender years," we derive additional guidance from the legislature's enactment of T.C.A. § 36-6-101(d), providing:

> It is the legislative intent that the gender of the party seeking custody shall not give rise to a presumption of parental fitness or cause of presumption in favor or against the award of custody to such party; provided, that in the case of a child of tender years, the gender of the parent may be considered by the court as a factor in determining custody after an examination of the fitness of each party seeking custody.

On appeal, Wife argues that the decision to award Husband custody was prompted by the trial court's undue bias and prejudice against her, which stemmed from the incident where she was found in contempt. Wife focuses upon the following comment made by the trial judge during the redirect examination of Husband, who was the first witness at trial:

Q.     Are you dating anyone?

A.     No.

Q.     Are you having relations with anyone?

A.     No.

Q.     Do you have any potential girlfriends waiting for you?

A.     No.

THE COURT: And you probably won't, with three children to take care of, either.

Wife contends that the trial court's "prejudg[ment]" of the case along with the "great emphasis" it placed on Wife's admitted adultery accounts for the custody award. She asserts that custody is properly with her when the comparative fitness of the parties and the "tender years" doctrine are given adequate consideration.

We first note the fallacy in Wife's argument that Husband failed to rebut the "tender

---

[2]These factors are now codified at T.C.A. § 36-6-106, effective June 12, 1995. The final judgment in this matter was entered on May 26, 1995.

years" presumption. As heretofore noted, a mother of a child(ren) of tender years is no longer afforded such presumption. *See* T.C.A. § 36-6-101(d); *Bah*, 668 S.W.2d at 666.

As to the matter of Wife's adultery, we agree that a parent's sexual infidelity or indiscretion does not, *ipso facto*, disqualify that parent from receiving custody of his/her children. *See Mimms v. Mimms*, 780 S.W.2d 739, 745 (Tenn.App.1989). When the activities of the parent involve neglect of the children, however, such neglect is a consideration in determining the children's best interests. *Mimms*, 780 S.W.2d at 745. The record does not support a finding that Wife was neglectful of the children due to her extramarital relationship with Mr. Ligon, nor was any such finding made by the trial court. We, however, are compelled to comment that we are unimpressed by Wife's decision to leave her six year old daughter with a broken arm (albeit in her father's care) to begin an illicit relationship with Ligon. In any event, there is no evidence in the record to suggest that Wife and Mr. Ligon acted inappropriately toward one another in the presence of these children and, therefore, we agree that the mere fact of Wife's adultery is an insufficient basis on which to award custody to Husband.

With respect to the trial court's comment, we find merit in Husband's position that Wife failed to object to the trial judge's continued participation in the proceedings, after making the comment, until this appeal from the decision rendered adversely to her. We quote the off-cited rule that "a party must complain and seek relief immediately after the occurrence of a prejudicial event and may not silently preserve the event as an 'ace in the hole' to be used in the event of an adverse decision." *Gotwald v. Gotwald*, 768 S.W.2d 689, 694 (Tenn.App.1988). *Gotwald* also recognized that "[i]t is not always the best practice for a Trial Judge to comment freely upon the details of the evidence heard. However, when this occurs, the correctness of the judgment reached is judged upon the result reached, rather than the explanatory comments of the Trial Judge." *Gotwald*, 768 S.W.2d at 695.

In this case, the trial court expressly found both parents to possess "adequate parenting skills" and to have done a "very good job" in caring for the children. The court, however, determined Husband more emotionally and morally stable. We review the trial court's findings of fact *de novo* upon the record, accompanied by a presumption of correctness. Unless the evidence

preponderates otherwise, we are to affirm, absent error of law. Rule 13(d) T.R.A.P.; *E.g., Howard G. Lewis Constr. Co. v. Lee*, 830 S.W.2d 60, 69 (Tenn.App.1991).

Our decision, as noted, is governed by our concern for the best interests of these children, which necessarily entails a determination of which parent is more fit to care for them. We find a preponderance of the evidence to support the trial court's findings that both of these parents have adequate parenting skills and have taken good care of the children. We further find the record to support the trial court's observation that of the two, Husband is more emotionally and morally stable.

It is clear to this Court that both parents love their children. What concerns this Court most, however, and was apparently a concern to the trial court, is Wife's blatant attempt to alienate the affections of the children from their father. When loved by both parents, children should be taught to love and respect each parent equally. This reciprocation, in turn, will garner self respect and a positive self image in the children. The record in this case lends absolutely no reason as to why the children should not be encouraged to respect and love their father. We do not find the record to show that Wife has supported such a healthy relationship between parent and child. Although Wife testified otherwise, her actions speak loud and clear. The children have hit their father, yelled at him (with no apparent discouragement from Wife) and failed to acknowledge him at Christmas. Moreover, the record includes a picture of the entire family which was altered to delete Husband's image and then returned to a frame where the children could observe in the family home.[3] The record also suggests that the children have been encouraged to develop a positive relationship with Mr. Ligon, which is not to be impugned except to the extent that such is detrimental to the children's relationship with their own father. Finally, the record does not reveal any similar attempt on Husband's behalf to dissuade the children from having a loving relationship with their mother.

We believe it in the best interests of these children that they maintain a loving and nurturing relationship with both parents. In light of the record, we do not believe that such can be accomplished by an award of custody to Wife at this time. It goes without saying that in many, if

---

[3]Husband's testimony in this regard was not disputed by Wife.

not most, cases of divorce, one may expect a certain amount of animosity between the divorcing parties. This case is no different. However, when children are involved, it is imperative that the parents set aside their hostilities where the children are concerned, for the sake of the children. Wife has not seen fit to put her children ahead of her own emotions where their father is concerned. We urge Wife in the future to resist transferring any ill will that she harbors toward Husband onto the children. After consideration of all relevant factors, including that it is in the children's best interests to maintain a loving relationship with both parents and Husband's emotional stability and maturity, we hold that custody was properly awarded him. We agree that Wife is entitled to liberal visitation with her children as has been awarded by the trial court.

Wife also challenges the trial court's failure to award her rehabilitative alimony. T.C.A. § 36-5-101(d) provides for the rehabilitation of an economically disadvantaged spouse, as relative to the other spouse, whenever possible "by the granting of an order for payment of rehabilitative, temporary support and maintenance." The statute enumerates certain factors to consider when determining whether an award of alimony is appropriate. Of these factors, need and the ability to pay are most critical. *Loyd v. Loyd*, 860 S.W.2d 409, 412 (Tenn.App.1993). Although Wife's monthly expenses of $1,275 exceed her current net monthly income of $582, according to her income and expense statement, many of the expenses were incurred on behalf of the children and will now be borne by Husband. Also, Wife's net monthly income is based on her current part-time employ. The record supports the trial court's finding that Wife is able-bodied with an earning capacity to support herself and the ability to increase her income. We believe Wife will be able to increase her earnings with full-time employ. Husband was ordered to pay all the marital debt, including the home mortgage and a debt to the IRS stemming from the bankruptcy, all of which totaled over $200,000. The marital home contained no equity at the time of the divorce. As the decision to award alimony is within the trial court's broad discretion, *Loyd*, 860 S.W.2d at 412, we can find no error based on the record before us.

Finally, we address Husband's issue regarding the trial court's failure to set child support for a period of one year. The court chose to deviate from the child support guidelines "due to the present financial situation of the Wife." We hold such deviation supported by the record and find no error in this regard.

It results that the judgment holding Wife in direct contempt is hereby reversed; the judgment in all other respects is affirmed.  Costs are taxed one-half to William Patrick Varley, Jr. and one-half to Pamela Dawn Varley, for which execution may issue if necessary.


_____
FARMER, J.


_____
CRAWFORD, P.J., W.S. (Concurs)


_____
HIGHERS, J. (Concurs)