IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 22, 2002

## NICOLE JEAN KEELER v. MICHAEL WINN KEELER

**Appeal from the Chancery Court for Montgomery County**
**No. 99-02-0021      Carol Catalano, Chancellor**

_____

### No. M2001-00684-COA-R3-CV - Filed August 2, 2002

_____

In this divorce case, the trial court awarded the parties joint custody of their minor children, with primary physical custody awarded to the father. The mother contends on appeal that she is the more fit parent and should have been given primary custody. We affirm the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM C. KOCH, JR. and WILLIAM B. CAIN, JJ., joined.

Andrew M. Cate, Nashville, Tennessee, for the appellant, Nicole Jean Keeler.

Andrea C. Rawlings, Clarksville, Tennessee, for the appellee, Michael Winn Keeler.

### OPINION

### I. MARRIAGE AND SEPARATION

Michael Winn Keeler and Nicole Jean Davis married in Clarksville on November 23, 1991. Mr. Keeler's parents gave them a two acre parcel of land adjoining their own home, upon which the newlyweds placed a mobile home they had purchased. The Keelers became parents on March 3, 1995, when their daughter, Delaina Lynn, was born. A son, Devon Michael, was born on January 13, 1998.

Both parties were gainfully employed during the entire course of their marriage. Ms. Keeler held a number of jobs as an accountant. Mr. Keeler worked continuously at State Industries starting in 1991. After the children were born, Ms. Keeler urged her husband to change his hours from the evening shift to the day shift so he could help take care of them. Mr. Keeler did so, even though the change of shift resulted in a substantial reduction in pay. Mr. Keeler's mother generally looked after the children while their parents were at work.

All was not well with the marriage, however, and in October of 1998, Ms. Keeler moved out of the marital home. On February 9, 1999, she filed a complaint for absolute divorce on the grounds of irreconcilable differences and inappropriate marital conduct. The husband's answer and counter-complaint admitted that there were irreconcilable differences between the parties, but denied that he was guilty of inappropriate marital conduct, and claimed that his wife herself was guilty of inappropriate marital conduct. On March 9, 1999, the court entered an agreed order, which gave Ms. Keeler temporary custody of the children.

At some point after the parties separated, Mr. Keeler began to believe that his wife was engaged in an intimate relationship with a man named Christian Stockwell, and he hired a private investigator to check out that possibility. He subsequently filed a motion for a temporary restraining order to prevent his wife from having the minor children in the presence of unrelated persons of the opposite sex. The motion was granted.

The investigator was able to confirm Mr. Keeler's suspicions. The husband then filed a motion for change in temporary custody, based upon his wife's violation of the restraining order, and upon proof that she drove erratically and at an extremely high rate of speed (in excess of 85 miles per hour) while the children were in the car. On November 5, 1999, the trial court granted the husband temporary custody of the children, pending the final outcome of the divorce.

The matter was set for final hearing on May 16, 2000. The father subsequently asked for a continuance. The trial court granted the continuance, but ordered that temporary custody of the children be transferred to the mother from June 1, 2000 until one week prior to the opening of the Montgomery County Public Schools. Mr. Keeler's mother was designated in the order as the daycare provider for the children.

## II. THE DIVORCE HEARING

The final hearing of the case was conducted on December 5, 2000. Ms. Keeler admitted on the stand that she was involved with Mr. Stockwell, but claimed that the relationship did not become intimate until after the parties separated, and that it did not precipitate the breakup of her marriage. She also insisted that she never spent the night with Mr. Stockwell in the presence of the children, despite the sworn testimony of the private investigator, and the introduction of a videotape he had taken, which indicated the contrary.

We note that there was a tremendous disparity between the testimony of the parties on questions related to their parental roles. If we were to believe Ms. Keeler's testimony, we would have to conclude that she was an ideal mother, who always put her children's needs ahead of her own, while Mr. Keeler was abusive, uncaring, and totally unhelpful when it came to meeting the children's needs. Mr. Keeler, to the contrary, portrayed himself as a loving father who adored his children, and who was an equal partner with his wife in caring for them.

There are too many points of disagreement between the parties than is possible to discuss in detail, but one example may serve to illustrate the differences in their testimony. Ms. Keeler testified that she always bathed the children in the evening, that Mr. Keeler never did, and that he invariably refused when asked to do so. Mr. Keeler testified that he usually gave the children their baths while his wife was preparing dinner, that he refused on only one occasion when he was recovering from a painful leg injury, but that he subsequently agreed to bathe them anyway, because his wife kept insisting. Mr. Keeler's father confirmed his testimony. There were similar disparities in testimony as to feeding the children, taking them to the doctor, and buying clothes for them.

Much of the testimony and argument in this case centered on Mr. Keeler's hunting. Ms. Keeler testified that her husband went hunting every chance he had, often camping out overnight, and returning home only to fall asleep on the couch while there was work to be done and the children to be looked after. Mr. Keeler testified that he had hunted since he was ten years old, that he owned numerous rifles, scopes, bows and camouflage outfits, and that he indeed loved hunting. He insisted, however, that he did not hunt nearly as frequently as Ms. Keeler testified, that he generally hunted in the morning, and that he did not go on overnight hunting trips.

At the conclusion of the hearing, the trial court dismissed Ms. Keeler's complaint for divorce, and awarded Mr. Keeler a divorce on the ground of inappropriate marital conduct. In her ruling from the bench, the judge noted that the question of custody had to be considered separately from the question of who was entitled to the divorce, and she analyzed the trial testimony in light of the question of comparative fitness for parental duties, as measured by the factors set out in Tenn. Code Ann. § 36-6-106.

The final decree of divorce, filed on February 16, 2001, memorialized the court's decision. The court determined that the parties were entitled to be awarded joint legal custody of the two minor children, but that it was appropriate to award the primary physical custody to the father. The mother's parental rights were spelled out in detail, including extensive visitation rights, the right to unimpeded phone calls and correspondence with the children, and the right to be promptly informed of each child's educational progress and health status. The mother was also ordered to pay $952 per month in child support, representing 32% of her net income, in accordance with the guidelines. *See* Tenn. Code Ann. § 36-5-101(e). The marital home was awarded to the father, but he was ordered to reimburse the mother for the value of her share in its equity. This appeal followed.

### III. CHILD CUSTODY

The custody of the children was the sole issue raised on appeal. We note that child custody determinations are among the most important decisions that any court has to make. *Steen v. Steen*, 61 S.W.3d 324 (Tenn. Ct. App. 2001); *Adelsperger v. Adelsperger*, 970 S.W.2d 482 (Tenn. Ct. App.1997). In such decisions, the best interest of the child or children is always the primary consideration for the court. *Rice v. Rice*, 983 S.W.2d 680 (Tenn. Ct. App. 1998); *Rogero v. Pitt*, 759 S.W.2d 109 (Tenn. 1988); *Bah v. Bah*, 668 S.W.2d 663 (Tenn. Ct. App. 1983).

While our courts have stated that there may be thousands of things that must be taken into account when dealing with young children, *Varley v. Varley*, 934 S.W.2d 659 (Tenn. Ct. App. 1996), the Legislature has set out the following list of factors to guide the courts in determining the best interests of the child:

> (1) The love, affection and emotional ties existing between the parents and child;
> (2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;
> (4) The stability of the family unit of the parents;
> (5) The mental and physical health of the parents;
> (6) The home, school and community record of the child;
> (7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;
> (8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person...
> (9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and
> (10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-101.

The trial judge discussed each of these factors in her ruling from the bench, and we will deal with those that she found most relevant. The judge found that both parents were equal in their love and affection for their children, and both were equally disposed to provide them with necessary care, and thus that neither of these important factors formed a basis for preferring one parent over the other on the question of custody. She also praised the parties for cooperating very well with each other in matters of visitation, and found them equal in their ability to foster close relationships between the children and the other parent.

The judge found, however, that questions of continuity and stability weighed heavily in the father's favor. The court noted that the children had lived in the marital home all their lives, and that the proximity to their paternal grandparents was very important for their care and emotional well-being. The mother voluntarily removed herself from that environment, and when she had the children during weekend visitation, she tended not to stay at her own apartment, but to bring them

with her for overnight visitation at the home of a long-time friend who also had young children.  The court found it to be more consistent with the children's best interest for them to continue to reside with their father in a familiar place, among family members who love them, rather than with their mother, in a place where she herself might not feel totally comfortable.

As for evidence of physical or emotional abuse, the court noted Mr. Keeler's testimony as to some bruises he found on the body of their daughter.  Mr. Keeler entered a photo of those bruises into evidence, and testified that his wife told him that she had spanked the little girl with a belt, but that when he showed her the photo she said it was a diaper rash.  In her rebuttal testimony, Ms. Keeler denied his account.  The judge was reluctant to make a finding as to the source of the bruises, but found it to be emotional abuse to expose the children to Mr. Stockwell before their parents were divorced.  Mr. Stockwell did not testify at the divorce hearing, so the judge was not in a very good position to evaluate his character and behavior, but she found his willingness to involve himself so intimately with a married woman and her young children to at least bring his character into question.

Ms. Keeler argues that the trial court erred by basing its custody determination so heavily on the mother's relationship with her boyfriend, in the absence of evidence that this relationship was detrimental to the children.  She cites the case of *Earls v. Earls*, 42 S.W.3d 877 (Tenn. Ct. App. 2000), as support for her position.  However, the situation in the *Earls* case was very different from the one before us.  Mr. and Ms. Earls had already determined for themselves that it was in the best interest of the child that the father exercise custody over their eight year old son.  The trial judge ignored their decision and the tragic circumstances that justified it, and awarded custody to the mother, because he believed that the father's relationship with another woman placed the child in moral jeopardy.  This court reversed, finding there to be overwhelming evidence that it was in the best interest of the child to be cared for by his father.

In the present case, the trial court did not find either party unfit or incapable of caring for the children, and the question of custody was more difficult.  Ms. Keeler's relationship with Mr. Stockwell was just one of several factors that tilted the decision to Mr. Keeler.  Aside from questions of stability and continuity, others included the mother's lack of credibility on matters of importance, her poor judgment, and her erratic driving habits.

Ms. Keeler also argues that the trial court failed to consider two relevant factors in her favor.  First, that her work schedule was far more flexible than Mr. Keeler's, enabling her to tailor her hours to meet the needs of her children.  Second, that as a college graduate, she is far better educated than her husband, who did not even graduate from high school, and thus that she is better able to help the children as they advance in school.  We agree that these factors militate in her favor, but we are not sure they are sufficient to overcome the factors that favor Mr. Keeler.  We note that although Mr. Keeler's work hours are far more rigid than his wife's, his mother lives next door, and is willing to continue helping out with the children whenever Mr. Keeler cannot be there.  Also, the divorce decree provides for generous visitation, and should make it possible for Ms. Keeler to continue to exercise a positive influence on her children's education.

A trial court's determination in child custody cases is accompanied by a presumption of correctness, and may not be reversed on appeal unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Whitaker v. Whitaker*, 957 S.W.2d 834 (Tenn. Ct. App. 1997); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984). We have read the transcript of the trial in its entirety, and although this case presents a close question, we do not believe the evidence preponderates against the trial court's decision.

**IV.**

The order of the trial court is affirmed. Remand this cause to the Chancery Court of Montgomery County for further proceedings consistent with this opinion. Tax the costs on appeal to the appellant, Nicole Jean Keeler.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.