IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 6, 2002 Session

## PETER JOHN ZABASKI v. MARY ANN DALE ZABASKI

**Appeal from the Circuit Court for Davidson County**
**No. 00D-130      Marietta M. Shipley, Judge**

———

**No. M2001-02013-COA-R3-CV - Filed December 11, 2002**

———

The trial court granted a divorce to the parents of an only child with a history of severe medical problems, and awarded them joint custody. The wife contends on appeal that the trial court's order of custody and visitation was not in the child's best interest. She also argues that the court erred by setting the husband's child support obligation too low, and by failing to award her alimony in futuro. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which PATRICIA J. COTTRELL, J. and THOMAS W. GRAHAM, SP. J., joined.

Mary Frances Lyle and David Lyle, Nashville, Tennessee, for the appellant, Mary Ann Dale Zabaski.

Thomas F. Bloom, Nashville, Tennessee, for the appellee, Peter John Zabaski.

## OPINION

### I.  A BELOVED CHILD

Peter John Zabaski and Mary Ann Dale Zabaski married on August 7, 1982. Their son Alex was born on January 11, 1992, when Mr. Zabaski was forty-three, and Ms. Zabaski was thirty-nine. Alex came into the world with numerous congenital defects, including transposed arteries and a cleft palate. The child underwent his first heart surgery when he was ten days old, and has since undergone fourteen other surgeries. Because of Alex's needs, the mother gave up her interior design business to dedicate herself to his care and upbringing. The father, a successful businessman, continued to work to support the family. He testified that he also took an active role in the child's upbringing, while the mother claimed that his participation was minimal prior to the institution of divorce proceedings.

Despite his medical problems, the proof shows that Alex has become a well-adjusted and confident child. At the time of trial, he was a fourth grader at the Ensworth School. He was doing very well academically, participated in sports, and had many friends. The mother argues that his success is largely due to her total devotion to his needs. The father argues that his contribution has also been important, particularly in the area of teaching his son organizational skills, promptness and self-control, and helping him academically.

While the parents may not have been in total agreement on some child-rearing questions, they were usually able to work out their differences. Unfortunately, they found it more difficult to agree about areas not directly related to child-rearing, especially money, about which they frequently argued. Their conflicts intensified in 1999, which was a difficult year for Mr. Zabaski. His mother passed away in July of that year. In December, the company he worked for was sold to another company, and he was told that he would have to move to Dallas if he wished to keep working. Mr. Zabaski had accumulated nearly $3 million through years of effort, and he chose not to make the move.

On January 14, 2000, Peter Zabaski filed a complaint for divorce. The complaint alleged irreconcilable differences and inappropriate conduct as grounds, without further elaboration. The wife's answer, filed on March 3, 2000 denied the grounds, but alleged as an affirmative defense, again without elaboration, that the ill conduct of the husband was a justifiable cause of the conduct he complained of. Mary Ann Zabaski did not file a counter-claim for divorce.

Despite the filing of the divorce complaint, both parties continued to live with their son in their 7,300 square foot home on Belle Meade Boulevard. In June of 2001, the parties signed a contract for the sale of the marital home. After the preliminary hearing on the complaint and the closing on the sale, Mary Ann Zabaski and Alex moved into a recently renovated, but somewhat smaller (2,026 square foot) house on Parmer Avenue that the parties owned, and Mr. Zabaski moved into a rented apartment.

## II. PROCEEDINGS IN THE TRIAL COURT

The court conducted a preliminary hearing on June 15, 2001. The Zabaskis' attorneys explained to the court that their clients had reached agreement on the division of the financial assets of the marriage. Among other things, they decided to equally divide the net proceeds of over $1 million that would result from the sale of the marital home. Mr. Zabaski agreed to quitclaim to his wife his interest in the Parmer Avenue house, a Belle Meade residence which was valued at $280,000, and the court agreed to allow him to withdraw $280,000 from his Trustmark Financial account to compensate for his surrender of the house to his wife.

The court also agreed to name Cathy Griffin as a mediator, to help the parties reach agreement on a child-rearing arrangement that would be in the best interest of Alex. Ms. Griffin was a counselor who had worked with the Zabaskis for several years. The court awarded Mary Ann

Zabaski pendente lite custody of Alex, with reasonable visitation for her husband, and ordered him to pay all utilities on the Parmer Avenue house, as well as pendente lite support of $350 per week.

The court held a hearing on July 24, 2001. The testimony of the parties and of Ms. Griffin made it quite evident that the parties exhibited very different temperaments, and almost opposite approaches to daily life. It appears that Mary Anne Zabaski is spontaneous and creative, but heedless of financial constraints and incapable of being on time, while Peter Zabaski is hard-working, highly organized, and punctual, but has been impatient and prone to anger. Ms. Griffin testified that these differences did not necessarily work to Alex's disadvantage, and that the child had managed to blend the positive traits of both of his parents. She testified that Ms. Zabaski nurtured his creative fun-loving side, while Mr. Zabaski taught strong values and maintained discipline.

Mary Anne Zabaski asked for sole custody of Alex, with normal visitation for the father. Peter Zabaski asked the court to order joint custody of Alex, with equal time for both parents. He submitted two alternate parenting plans: one would switch custody weekly, the other would have both parties exercising custody for half of each school week, with alternating custody on weekends.

Ms. Griffin declined to make a recommendation, because she considered that to be outside the purview of her role as mediator. She stated, however, that despite their other conflicts, both parents had always managed to cooperate very well on matters involving their child, and had done an excellent job of raising him. She also said that both parties needed to have lives and interests of their own, and that it was not in the child's best interest for either of them to be solely focused on his welfare. She further observed that Alex was an extremely resilient child, but expressed concern that moving too frequently from one parent to another could lead to difficulties.

There was extensive testimony as to the financial affairs of the parties, which we need not discuss in any detail in this section. Peter Zabaski argued that he should not have to pay any alimony or child support, in light of the income from the investments that his wife would be receiving as her share of the marital property, and of his proposal that Alex spend as much time with him as with the mother. Ms. Zabaski argued that she needed much more support than the marital investment property would generate, because of the standard of living she and Alex had grown accustomed to, and the need to keep up with the very wealthy families of the child's classmates.

At the conclusion of the trial, the court granted both parties a divorce pursuant to Tenn. Code Ann. § 36-4-129. In accordance with the parties' wishes, the court divided the marital property equally between them. As a result, they each received assets worth a total of $1,493,395. Mary Ann Zabaski's share included $901,000 in liquid assets, and a house with no mortgage. There is no question on appeal as to the fairness of the property division. There is a dispute, however, as to how much income the financial assets can be reasonably expected to generate.

The court awarded joint legal custody of Alex to both parents, with the wife designated as the primary residential parent. *See Gray v. Gray*, 78 S.W.3d 881 (Tenn. 2002). The decree included an eight-page Permanent Parenting Plan with a Residential Sharing Schedule that divided custody

equally between the parties. While the division of time for holidays, school breaks, and summer vacations followed a conventional pattern, the schedule for the school year was somewhat unusual. It provided that Alex was to spend Mondays and Tuesdays with the mother, Wednesdays and Thursdays with the father, and alternate weekends with each parent.

In calculating child support, the trial court found that Mr. Zabaski had no salary income, but that his investment income amounted to $6,600 per month. The court used this figure to calculate a presumptive obligation of $1,389 under the Child Support Guidelines. The court then deviated downward from the presumptive amount to compensate for the fact that the husband was to exercise greater than standard visitation, and set the final child support obligation at $1,000 per month. The court also ordered Mr. Zabaski to pay for Alex's private education through twelfth grade, and his medical insurance, summer camps and tutoring.

The court wished to leave the question of alimony open, because of uncertainty about the return on Ms. Zabaski's investments, and the possibility that Mr. Zabaski might return to the workforce someday. The court accordingly awarded Ms. Zabaski $1.00 per month as nominal alimony in futuro, because, "[t]he Court is not expecting to award alimony, but the Court does not want to preclude it." The court also awarded Ms. Zabaski $18,412 in attorney fees as alimony in solido.

Ms. Zabaski filed a notice of appeal of the trial court's order, and a motion to stay the Residential Sharing Schedule, pending the result of that appeal. The trial court denied the motion on December 7, 2001. Ms. Zabaski then filed a motion with this court requesting a stay. After reviewing the motion and supporting documents, we could find no grounds to reverse the trial court's decision regarding the stay, and we denied Ms. Zabaski's motion on January 22, 2002.

## III. CHILD CUSTODY

Mary Ann Zabaski argues that the trial court erred in ordering joint custody of Alex. She contends that "joint child custody, with its implied joint decision making is generally disfavored in contested cases." While this may once have been true, the Legislature has eliminated any legal presumption against joint custody with the 1996 passage of Tenn. Code Ann. § 36-6-106(a)(2), which declares,

> ". . . neither a preference nor a presumption for or against joint legal custody, joint physical custody or sole custody is established, but the court shall have the widest discretion to order a custody arrangement that is in the best interest of the child."

We note that the trial court's decisions on custody are considered to be findings of fact, and are reviewed by this court with a presumption of correctness, unless the evidence preponderates otherwise. *See* Rule 13(d), Tenn. R. App. P.; *Hass v. Knighton*, 676 S.W.2d 554 (Tenn. 1984).

We also note that this case presents a very unusual set of facts. Unlike most divorcing couples, the Zabaskis experienced a very short period of separation prior to the final hearing of the divorce complaint, and Alex resided with both his parents until shortly before the court made its final custody determination. Thus the trial court was compelled to deal with the question of custody before any of the parties had the opportunity to explore the advantages and disadvantages of any of the possible custodial arrangements that the divorce might require.

Ms. Zabaski objects to every aspect of the residential sharing schedule. She argues that it is not in Alex's best interest for the parents to share equally in decision-making; that since she has been Alex's primary caregiver, the trial court should have created a schedule whereby Alex spent the majority of his time in her custody; and that the visitation schedule is flawed, because it requires Alex to undergo far too many moves from household to household during the school year. We will examine each of these arguments in turn.

## A.

Ms. Zabaski states that she and her husband have always had a hard time agreeing about anything, and she describes several incidents which she claims prove that any disagreements between them resulted from Mr. Zabaski's inflexible and unreasonable nature. We agree that it was unreasonable for Mr. Zabaski to sulk in his car during a birthday party at Chuck E. Cheese for one of Alex's friends, and to yell at his son during a trip to Cleveland undertaken for medical reasons. It appears to us, however, that within the context of the nine years that the parties jointly raised Alex, a few such incidents should not disqualify Mr. Zabaski from participating in decision-making on an equal basis with his former wife.

The parents' own testimony, as well as that of Ms. Griffin indicates that for all the disagreement between them on other matters, they have done remarkably well in reaching agreement in regard to Alex. Somehow, when it comes to their son, they are usually (although not always) able to put aside their personal differences, and to act in concert for Alex's benefit. Thus, we do not find that the evidence preponderates against the trial judge's decision to give the parties equal responsibility for making decisions.

## B.

Mary Anne Zabaski insists that while she has always been Alex's primary caregiver, her husband functioned primarily as a breadwinner prior to leaving his job, and that he had very little involvement in Alex's day-to-day care. She alleges that only after filing for divorce has he taken an active role in his son's life. Peter Zabaski admitted that his wife was the primary caregiver, but testified that despite the demands of his job, he has always participated in Alex's care to the extent that his schedule allowed. The trial court apparently gave credence to his testimony.

Mr. Zabaski testified that when Alex was a baby, he and his wife shared the duties of feeding the child, getting up in the middle of the night when he was ill, and changing diapers. He also read

to Alex, and took primary responsibility for giving him a bath every night. While Ms. Zabaski took more responsibility for Alex's routine medical care, Mr. Zabaski was almost always present when Alex was undergoing surgery.

Mr. Zabaski further testified that he regularly took Alex to soccer, basketball and football practice, acted as an assistant basketball coach, participated in scouting, attended teacher meetings, school plays and pancake breakfasts, and helped with homework. He also generally took Alex to his appointments with the orthodontist and the ear doctor. Obviously, most of this took place after Mr. Zabaski stopped working. However, we do not believe that the mother has demonstrated an entitlement to sole custody on the basis of her role as the primary caregiver, for both parties have demonstrated the ability to effectively focus their energies on Alex's needs.

## C.

A schedule whereby custody of a minor child alternates between the parents during each school week is quite unusual, and would probably be unworkable if the parties lived very far from each other, but they apparently live quite close. Mr. Zabaski testified as to the reason he suggested such an arrangement:

> "Well, because it does allow Alex a schedule that's easy for him to understand to work with his school as far as hook-ups; other parents would know exactly where Alex would be on what day and it would be consistent. Whereas, actually, Friday we could run hook-up, Mary Ann and me. So we would be in control of whether Alex is with us or not on that day and that wouldn't interfere with the other parents."

We take "hook-up" to be a car-pooling arrangement, perhaps with some additional responsibilities for the parents involved.

The negative side of the schedule is the frequency with which custody of Alex is transferred from one parent to another. Ms. Zabaski calls this a "revolving-door residential schedule," and complains that Alex is required to sleep in a different bed than the one he slept in the night before seventeen times each month. She notes the reservations Ms. Griffin had expressed about such an arrangement at trial, and argues that it can lead to long-term psychological harm to a child. Ms. Griffin had mentioned a study which is critical of such joint custody arrangements, "The Unexpected Legacy of Divorce," by Judith Wallerstein et al (Hyperion 2001). Ms. Zabaski included a copy of the relevant chapter in the appendix to her appellate brief.

It appears to us, however, that questions of custody and visitation are very fact-driven and individualized, and that it is not always possible to find an ideal solution. The Wallerstein study makes the very same points. In the present case, the trial court had to balance the advantages of giving Alex abundant exposure to both his parents, and a regular and predictable school schedule, against the possibility that frequent changes of household could introduce a disorienting element into

his life. While we cannot say with certainty that the court reached the best possible solution, we also do not believe that the evidence preponderated against its decision.

## IV. Child Support

In the three years immediately preceding his filing of the divorce complaint, Peter Zabaski earned an average of $173,000 a year working for SEI Management Inc. After he lost his job, he chose not to go right back to work, although he worked for a new company for three months in the spring of 2000, at an annual salary of $108,000. By the summer of 2000, he decided to focus his attention on the divorce and on his son, without working outside the home. He was able to do so because his financial assets generated income which the trial court estimated at $6,600 per month.

The court used the figure of $6,600 as a basis for calculating Mr. Zabaski's presumptive child support obligation of $1,389 under the child support guidelines. In light of the amount of time Mr. Zabaski would be caring for Alex, the court reduced the actual amount of the obligation to $1,000 a month. Mary Ann Zabaski argues that the trial court erred by relying on Mr. Zabaski's investment income alone as the basis of its calculations. She correctly points out that the Tennessee Child Support Guidelines provides that "[i]f an obligor is willfully and voluntarily unemployed or underemployed, child support shall be calculated based on a determination of potential income, as evidenced by educational level and/or previous work experience." Tenn.Comp.Rules & Regs. Ch 1240-2-4-.03(d).

It appears to us that Mr. Zabaski is willfully or voluntarily unemployed, and the trial court should have so found. *See Garfinkel v. Garfinkel*, 945 S.W.2d 744 (Tenn. Ct. App. 1996). The trial court should have included Mr. Zabaski's potential net salary income in its calculation, and its written findings should have included the presumptive child support obligation resulting from its inclusion. *See Brooks v. Brooks*, 992 S.W.2d 403 (Tenn. 1999). We think the proof shows that Mr. Zabaski has the potential to earn $173,000 per year or $14,416 per month. That may or may not translate to a net income of less than $10,000 per month, but under a recent amendment to Tenn. Code Ann. § 36-5-101(e)(1)(B), child support cannot be based on an amount greater than that without proof that a greater amount of support is reasonably necessary for the child's needs. There is no such proof in this case; therefore the maximum child support Mr. Duke would have to pay on his potential income would be $2100 per month.

We note that calculations under the child support guidelines create a rebuttable presumption of the correct amount of child support, and the final award can deviate from that presumption when the strict application of the guidelines would be unjust or inappropriate. Tenn. Code. Ann. § 36-5-101(e)(1)(A).

The purposes set out in the child support guidelines include the following: "[t]o ensure that when the parents live separately, the economic impact on the child(ren) is minimized and to the extent that either parent enjoys a higher standard of living, the child(ren) share(s) in that higher standard." Tenn.Comp.Rules & Regs. Ch 1240-2-4-.02(2)(e). Child support is clearly awarded for the benefit of the child, and any benefit to the obligee parent is merely incidental.

In the present case, the equal division of the abundant marital property enables Alex to share in the comfortable standard of living that his mother and his father both enjoy. Under the circumstances of equally divided custody, strict adherence to the guidelines might enable Mary Anne Zabaski to enjoy a more luxurious lifestyle, but it does not appear to us that it would result in any increased benefit to Alex.

It is self-evident that the guidelines provision relating to unemployment or underemployment is designed to prevent a parent from evading his obligation to support his child by willfully reducing the amount of income subject to the guidelines, and to make certain that a child is not thereby deprived of support necessary to his well-being.

The proof in this case shows that Peter Zabaski has never evaded his obligation to support his son. In fact he has gone beyond any support obligation the court is authorized to impose upon him by placing $55,000 in a tax-deferred college savings fund for Alex. There is no indication in the record that the child suffers from any unmet material needs, but if Mr. Zabaski were compelled to return to work in order to pay the presumptive amount of child support, Alex would no longer be able to enjoy the same measure of attention and guidance that his father can provide under the custody arrangement fashioned by the court. It thus appears to us that the trial court set the proper amount of support for Mr. Zabaski to pay, and we affirm the judgment as a deviation from the guideline amount based on the presumptive income.

## V. ALIMONY

The purpose of alimony is "to aid the disadvantaged spouse to become and remain self-sufficient and, when economic rehabilitation is not feasible, to mitigate the harsh economic realities of divorce." *Anderton v. Anderton*, 988 S.W.2d 675, 682 (Tenn. Ct. App. 1998). While we have no doubt that the emotional consequences of divorce are almost always harsh, any economic hardship suffered by the wife in the present case has been mitigated by the generous provisions of the property settlement ratified by the court.

We note that there are no hard and fast rules for determining alimony, *Crain v. Crain*, 925 S.W.2d 232 (Tenn. Ct. App 1996), but that such decisions hinge on the unique facts of each case, in light of the factors listed in Tenn. Code Ann. § 36-5-101(d). Many of these factors, such as the duration of the marriage and the relative earning capacity of the parties would appear to favor the wife, but we believe they are outweighed in this case by factor (H), "the provisions made with regard to marital property as defined in § 36-4-121."

Additionally, our courts have stated numerous times that the most important factors to consider when determining an alimony award are the demonstrated need of the disadvantaged spouse and the obligor spouse's ability to pay. *Anderton v. Anderton*, 988 S.W.2d 675, 683 (Tenn. Ct. App. 1998). *See also Varley v. Varley*, 934 S.W.2d 659 (Tenn. Ct. App. 1996); *Barnhill v. Barnhill*, 826 S.W.2d 443 (Tenn. Ct. App. 1991). Our courts have also stated that when the court is fashioning an initial alimony award, the need of the recipient spouse is the single most important factor to consider. *Bogan v. Bogan*, 60 S.W.3d 721 (Tenn. 2001). *See also Cranford v. Cranford*, 772 S.W.2d 48 (Tenn. Ct. App. 1989).

The Legislature has explicitly declared its preference for rehabilitative alimony over alimony in futuro, because of the desirability of ending the dependence of one spouse on another. Tenn. Code Ann. § 36-5-101(d). For similar reasons, our courts have approved of the practice of awarding the obligee spouse a greater share of the marital property, in order to reduce or eliminate the need for spousal support. *Robertson v. Robertson,* 76 S.W.3d 337 (Tenn. 2002); *Lancaster v. Lancaster*, 671 S.W.2d 501 (Tenn. Ct. App. 1984).

The proof shows that Ms. Zabaski is capable of earning only a modest income as an interior designer. Thus, if earned income were her only source of support, she would be a prime candidate for alimony in futuro, given the vast disparity between her earning capacity and that of her husband. However, the court's decree granted her assets worth $1,493,000. These included $901,000 in liquid assets, a $280,000 residence unencumbered by mortgage, and a half-interest in commercial property from which she will receive $2,700 in monthly rental income. She will also receive $1,000 per month in child support. We believe this should be sufficient for her to avoid any further financial dependence on her husband, even if she chooses never to go back to work.

Mary Anne Zabaski argues, however, that her investment income will not be adequate for her needs. Her income and expense statement gives us a revealing glimpse into Ms. Zabaski's concept of need. Her statement lists monthly expenses of $11,425. Items in the statement include a mortgage payment of $2,000, even though there is no mortgage on her house, $1,100 a month for charitable contributions, $950 a month for gifts, $780 a month for home cleaning and maintenance, $750 a month for Alex's clothing and shoes, $500 a month for travel and entertainment, and $270 a month for books, newspapers and magazines.

The trial judge found Ms. Zabaski's allowance for herself to be "quite generous" and for purposes of calculation, she reduced the monthly expenses to $7,500,[1] while noting that it could arguably be set $2,000 lower. The judge suggested that a reasonable return on the liquid assets would be 6%, which would result in a monthly income of about $4,500. The lease income and child support would add $3,700, for a total of $9,200. It is thus abundantly clear that Ms. Zabaski does not need alimony to meet her reasonable expenses.

---

[1] Appellant mischaracterizes the trial judge's conclusion by stating that the judge found Ms. Zabaski's <u>minimum</u> economic needs to be $7,500 per month.

The wife argues that the assumption of a 6% return on investment is not supported by any evidence in the record, but this is untrue. Rodger Reed, a certified financial planner, testified that the historical results of several different mixes of stocks and bonds have resulted in average annual returns between 5.13% and 9.1%. Of course Mr. Reed conceded that he couldn't guarantee any particular return (the familiar disclaimer that "past results are no guarantee of future performance" comes to mind), and Mr. Reed admitted that returns for the past three years were considerably below historical averages.

It appears reasonable to us for the trial court to adopt a rate of return within the range testified to in the record. We also believe that it was reasonable for the trial court to award Ms. Zabaski nominal alimony of $1.00 per month, to maintain jurisdiction over the question of alimony, in case the stock market's dismal showing over the past three years continues.

However, in light of Ms. Zabaski's announced intention to spend $250,000 of her liquid assets to purchase a larger house for herself and Alex, we would like to offer a cautionary observation. One of Ms. Zabaski's main arguments was that her husband stopped working just so he could obtain joint custody of Alex and avoid paying child support. While we cannot evaluate the truth of this assertion, we must warn the appellant against retaliating in kind. If she dissipates the assets she has received in hopes of obtaining a larger child support award and a grant of alimony in futuro, thereby forcing Mr. Zabaski to go back to work, we're certain that the courts will not look favorably upon such actions.

## VI. ATTORNEY FEES

Both parties have submitted arguments related to the award of attorney fees. Mr. Zabaski argues that the trial court erred in awarding his wife attorney fees as alimony in solido in the amount of $18,412. Ms. Zabaski argues that the award was justified, and that this court should also award her the attorney fees and court costs she has incurred on appeal.

It has long been established that attorney fees may properly be allowed in divorce cases as part of the alimony award. *Raskind v. Raskind*, 325 S.W.2d 617 (Tenn. 1959). The reasoning behind such awards is that the recipient spouse should not be required to deplete the funds necessary for support in order to pay an attorney. Several of our cases have stated that such awards are inappropriate where the recipient has sufficient funds to pay his or her legal expenses. *Wade v. Wade*, 897 S.W.2d 702 (Tenn. Ct. App. 1994); *Harwell v. Harwell*, 612 S.W.2d 182 (Tenn. Ct. App. 1980). In the present case, the property division has provided Ms. Zabaski with enough money to pay her attorney and still maintain a reasonable standard of living.

However, an award of attorney fees is considered to be largely within the discretion of the trial court, and will not be reversed on appeal, except upon a clear showing of abuse of that discretion. *Houghland v. Houghland*, 844 S.W.2d 619 (Tenn. Ct. App. 1992); *Crouch v. Crouch*, 385 S.W.2d 288 (Tenn. 1964). In light of the court's decision to grant only nominal alimony to Ms.

Zabaski, we do not believe the trial court abused its discretion in ordering her husband to pay her attorney fees.

Attorney fees are sometimes awarded on appeal in cases involving issues of child support. The rationale is that in defending a child support award or in winning an increase in child support, a custodial parent incurs costs for the benefit of the child. The cost of obtaining the benefit reduces the funds actually available to the child, and thus it is considered more appropriate for the non-custodial parent to bear the expense. *Huntley v. Huntley*, 61 S.W.3d 329 (Tenn. Ct. App. 2001); *Ragan v. Ragan* 858 S.W.2d 332 (Tenn. Ct. App. 1993).

In the present case, the husband did not challenge the trial court's decision on child support, and we rejected the wife's argument that she was entitled to an increase in support, because we found that such an increase would be more of a benefit to her than to her child. We therefore do not believe she should be awarded any attorney fees on appeal.

## VII.

The trial court's judgment is modified to find that Mr. Zabaski is voluntarily unemployed. We, however, affirm the amount of child support set by the trial court due to the unique circumstances of this case. In all other respects, the judgment of the trial court is affirmed. Remand this cause to the Circuit Court of Davidson County for further proceedings consistent with this opinion. Tax the costs on appeal to the appellant, Mary Ann Dale Zabaski.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.

-11-