# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### March 23, 2011 Session

## PEGGY DIANA SCHROER v. RICHARD MICHAEL SCHROER

**Appeal from the Chancery Court for Rutherford County**
**No. 09-0763DR     David M. Bragg, Judge**

---

**No. M2010-01478-COA-R3-CV - Filed August 25, 2011**

---

The trial court granted both parties an absolute divorce after a marriage of twenty-four years, divided the marital property equally between them, and declared that neither party was to be awarded alimony. The husband appeals, arguing that the property division was inequitable because he came into the marriage with $500,000 worth of separate property while the wife only owned a negligible amount of separate property at the time of the parties' marriage, and also because he was also the primary wage earner during the marriage. He also argues that the trial court should have awarded him alimony. The wife asserts that the husband's separate assets became marital property over the years through the processes of commingling of assets or transmutation, and that the equal division of that property was equitable. She also denies that the husband is entitled to alimony. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT and RICHARD H. DINKINS, JJ., joined.

Larry Hayes, Jr., Nashville, Tennessee, for the appellant, Richard Michael Schroer.

Darrell L. Scarlett, Murfreesboro, Tennessee, for the appellee, Peggy Diana Schroer.

## OPINION

### I. A MARRIAGE OF LONG DURATION

Peggy Diana Schroer ("Wife") and Richard Michael Schroer ("Husband") married on July 19, 1985. They raised a son and a daughter, who had reached their majorities by the time of the proceedings described herein. On May 26, 2009, Wife filed a Complaint for Legal Separation in the Chancery Court of Rutherford County. Wife's complaint included

a request for pendente lite support and for a division of marital property that would enable her to move out of the marital home. On June 1, 2009, the trial court appointed a Special Master to hear all the interim issues in the case.

On July 15, 2009, the parties entered into an agreed order, by which Husband was permitted to retain exclusive use of the marital home. He also obligated himself to use an existing line of credit secured by the home to pay for an appraisal of the property and to give $6,000 to Wife. Husband agreed to make interest-only payments on the line of credit, pending further orders of the court. The parties agreed to work together to divide their personal property and to mediate their differences after the home appraisal was completed. The mediation was not successful.

On March 19, 2010, Wife filed an Amended Complaint, in which she asked for an absolute divorce from Husband. The Special Master conducted a hearing on March 24, 2010, and filed a report containing findings of fact and conclusions of law. The Special Master found that Wife had contributed to the maintenance and creation of the marital estate and that she had a need "for some spousal support." Husband was accordingly ordered to pay her $500 per month as temporary support until the trial of the case.

On April 30, 2010, Husband filed an answer to Wife's amended complaint and a counterclaim for absolute divorce. He asserted that he was economically disadvantaged as compared to Wife, because he was totally disabled and living on a fixed income. He accordingly asked the court to order Wife to pay him alimony. In their pleadings, both parties asserted that irreconcilable differences had arisen between them, and each alleged that the other had been guilty of inappropriate marital conduct.

## II. THE FINAL DIVORCE HEARING

The final hearing of this case was conducted on May 6, 2010. The parties announced to the court at the outset that it would be justified in declaring the parties divorced pursuant to Tenn. Code Ann. § 36-4-129, rather than awarding the divorce to one party or the other. They also announced that they had reached agreement on the division of the parties' collection of stones and of the books in their extensive library. Because the parties had agreed to take the question of fault out of contention, the divorce hearing focused almost exclusively on financial matters.[1]

---

[1]The record includes an exceptionally well-organized collection of 45 exhibits, including financial and tax documents, deeds, photos, and a list of every book on the parties' bookshelves.

The forty-six year old Wife testified that she had earned a high school diploma, but never went to college. The proof showed that she worked during the entire marriage, taking time off only for maternity leave. She operated a daycare business out of her home for much of the marriage, but possessed secretarial skills that she updated several years before the divorce. At the time of trial, she held a job as a secretary in the athletic department at Middle Tennessee State University and was paid $13.10 per hour. She was preparing to take a certification test, and she anticipated that if she passed the test and obtained certification, she would receive a 9% pay raise. Her 2009 income tax return showed an adjusted gross income of $30,720.[2] Her 401(k) retirement account had a value of $2,846 on December 31, 2009.

The forty-seven year old Husband earned a high school diploma and attended college for two years. He began working for United Parcel Service about eleven years before the parties married. He continued working there even after he was diagnosed with an advanced form of throat cancer in 1998. He underwent surgery, which was followed by radiation therapy. Although his doctors gave him only six months to one year to live, he has survived far longer. He continued to work until 2007, when he underwent additional surgery for the removal of the middle lobe of his right lung.

Husband testified that his radiation treatment had destroyed his salivary glands. He can no longer swallow food, but has to feed himself through a tube in his stomach. Because of this and other effects of his cancer and of its treatment, he tires easily and only has energy for about three hours of activity a day. He was classified as totally disabled in 2007, and began receiving social security disability checks of about $2,010 per month. He also receives a pension from UPS that adds $3,040 to his monthly income.

The testimony of the parties shows that the Husband attempted to keep his finances separate from Wife's as much as possible during their marriage. In 1986, Husband inherited $171,448 from his father, and he placed the money in a separate J.C. Bradford account. In 2002, his mother died, and he inherited $35,000 from her estate, and he deposited the proceeds into his own bank account. Both parties had separate checking accounts. Wife used her checking account to pay for food, clothing, healthcare expenses, the needs of the children and other daily necessities. Husband used his checking account to make house payments and to pay for utilities, taxes and insurance.

A considerable amount of testimony and other evidence involved the most valuable asset of the parties: a 60.79 acre property at 4851 Vincion Road in Murfreesboro, upon which are located the marital residence and several outbuildings. The parties agreed to place the

---

[2]It appears that some of her income was derived from overtime hours she worked during the football and basketball seasons at the University.

appraiser's report into evidence without requiring that the appraiser himself appear to testify. According to the appraisal, the market value of the property was $575,000.[3]

Husband contended that although the parties acquired the Vincion Road property during the course of the marriage, it should be considered his separate property because he used his pre-marital assets to purchase it. He argued that even if it was deemed to be marital property, he was still entitled to receive more than 50% of its value because of his contribution to its acquisition. For her part, Wife contended that the Vincion Road property was marital property, and she asked the trial court to divide it equally between the parties.

The proof showed that at the time the parties married, Husband owned a house and 54 acres of surrounding farmland on Bakers Grove Road near Percy Priest Lake. The farm was not totally paid for, and Wife testified that Husband continued making payments to the previous owner for years after they married.[4] Husband testified, however, that "I had paid over half the payments on that farm before I met her." Wife also testified that the parties bought an additional five acres during their marriage and added it to the Bakers Grove Road property. For her part, Wife owned a house before the parties married and subsequently sold it, but since the mortgage debt was greater than the value of the house, the sale did not result in any net gain for the marital estate.

The parties lived in the house on Bakers Grove Road during the first two years of their marriage. They then purchased a house on Red Oak Trail in a Murfreesboro subdivision for $131,500 and lived there from 1987 through 1998. The house on Red Oak Trail was titled in the names of both parties. After the parties moved to Red Oak Trail, Husband divided the Bakers Grove Road property into two parcels that were sold separately. The home that the parties had lived in and the 3.8 acres surrounding it were sold in 1996 for $84,400. The remaining fifty acres were sold for $339,986 in 2004.

In 1996, the parties bought a tract of vacant land on Vincion Road for a purchase price of $188,449, with the intention of building a new home for themselves on it. Husband used funds from his separate checking account for the earnest money and the down payment. At

---

[3]Although they allowed the appraisal to be admitted into evidence, the parties both disputed the accuracy of the appraised value of the property. Wife noted that land adjacent to theirs had sold for about $15,000 an acre and that in 2004 or 2005, a prospective buyer had offered Husband $1.2 million for their property. Because of the decline in real estate values since that time, she estimated the property to be worth $750,000. Husband pointed to some more recent sales of property in the area that fetched only $2,250 per acre, and he contended that the current value of the property was therefore no more than $500,000.

[4]Husband's first wife quitclaimed any interest in the Baker's Grove Road property by a deed that was executed in 1980.

Wife's insistence, the Vincion Road property was titled in the names of both parties.

Husband testified that notwithstanding the legal title, he told Wife that he considered the Vincion Road property to be his separate property because, from his point of view, he was simply replacing the Bakers Grove Road property with the new property. For her part, Wife testified that she did not agree because she was not willing to exchange the home she co-owned on Red Oak Trail for a piece of property in which she would have no legal interest. In 1998, the parties took out a $300,000 construction loan to build a house on the Vincion Road property and they sold the home on Red Oak Trail for $187,000. The unpaid balance on the construction loan was paid off from the proceeds of the 2004 sale of the last parcel of the Bakers Grove Road property.

At the conclusion of the proof, the trial court announced its decision from the bench. The court commended Husband for keeping detailed financial records, but held that the fact that he kept those records and that he made house payments from an account in his own name was not enough "to overcome the fact that these parties lived together as man and wife for 25 years and shared that life together . . . ." The court accordingly determined that the home on Vincion Road was marital property, "based on the length of the marriage and the contributions that each party made during the course of the marriage." The court also declared that two-thirds of Husband's UPS pension was marital property, because it had accrued during the parties' marriage, while the other one-third of the pension had accrued prior to the marriage and remained Husband's separate property. *See* Tenn. Code Ann. § 36-4-121(b)(1)(B); *Kendrick v. Kendrick*, 902 S.W.2d 918, 921 (Tenn. Ct. App. 1994).

The court decided that in light of the duration of the marriage, it would be most equitable to divide the marital property equally. It accordingly gave Husband the option of buying out Wife's interest in the marital home for $250,000. If that did not occur, the home was to be sold in accordance with a procedure set out by the court, with the net proceeds to be divided equally between the parties. Two-thirds of Husband's UPS pension was also ordered to be divided equally between the parties through a Qualified Domestic Relations Order. Wife's 401(k) account was likewise to be equally divided between the parties, through a separate Qualified Domestic Relations Order. Neither party was awarded alimony. The trial court's decision was memorialized in a Final Decree, entered on June 7, 2010. This appeal followed.

## III. ANALYSIS

### A. Property Division in Divorce Cases

Tennessee Code Annotated § 36-4-121(a)(1) authorizes the trial court in actions for divorce or for legal separation to equitably divide, distribute, or assign the marital property "without regard to marital fault in proportions as the court deems just." The court is directed to consider all the relevant factors in its distribution of marital property, including those listed as follows in Tennessee Code Annotated § 36-4-121(c).

(1) The duration of the marriage;
(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
(3) The tangible or intangible contributions by one (1) party to the education, training or increased earning power of the other party;
(4) The relative ability of each party for future acquisitions of capital assets and income;
(5) The contribution of each party to the acquisition, preservation, appreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled his or her role;
(6) The value of the separate property of each party;
(7) The estate of each party at the time of the marriage;
(8) The economic circumstances of each party at the time the division of property is to become effective;
(9) The tax consequences to each party; and
(10) Such other factors as are necessary to consider the equities between the parties.

An equitable, or fair, property division "is not achieved by a mechanical application of the statutory factors, but rather by considering and weighing the most relevant factors in light of the unique factors of the case." *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988). In dividing the marital property, "[t]he trial court is empowered to do what is reasonable under the circumstances and has broad discretion in the equitable division of the marital estate." *Keyt v. Keyt*, 244 S.W.3d 321, 328 (Tenn. 2007) (citing *Flannary v. Flannary*, 121 S.W.3d 647, 650 (Tenn. 2003)). *See also Jolly v. Jolly,* 130 S.W.3d 783, 786 (Tenn. 2004); *Smith v. Smith*, 984 S.W.2d 606, 609 (Tenn. Ct. App. 1997).

As a general matter, reviewing courts will evaluate the fairness of a property division by its final results. *Thompson v. Thompson*, 797 S.W.2d 599, 604 (Tenn. Ct. App. 1990). Further, "unless the court's decision is contrary to the preponderance of the evidence or is based on an error of law, we will not interfere with the decision on appeal." *Sullivan v. Sullivan*, 107 S.W.3d 507, 512 (Tenn. Ct. App. 2002)(citing *Goodman v. Goodman*, 8 S.W.3d 289, 298 (Tenn. Ct. App. 1999)). Thus, appellate courts ordinarily defer to the trial court's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence. *Jolly v. Jolly*, 130 S.W.3d at 785-86; *Kinard v. Kinard,* 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998).

### B. Husband's Property Arguments

Husband acknowledged during oral argument that he no longer relies upon the argument he raised at trial that the marital home at Vincion Road should be considered his separate property because of his contribution to its acquisition. He therefore implicitly concedes that the proceeds derived from the Bakers Grove Road property became marital property.

Husband argues, nonetheless, that he is entitled to a larger share of the equity in the Vincion Road property than the court awarded him. He asserts that only one of the factors set out in Tenn. Code Ann. § 36-4-121(c), "the duration of the marriage," favors an equal division of the marital assets, while the other relevant factors suggest otherwise, including factor (7), "[t]he estate of each party at the time of the marriage."

We note that the parties' pre-marital assets are an especially important factor when a marriage is one of short duration. The reason is that under that circumstance, the court will attempt to divide the marital property in such a way as to restore the parties to the position they would have been in if the marriage had never occurred. *Powell v. Powell*, 124 S.W.3d 100, 107 (Tenn. Ct. App. 2003)(citing *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988)). When the marriage is one of long duration, however, the pre-marital assets assume far less importance.

One factor that retains a great deal of importance regardless of the duration of the marriage is factor (5):

The contribution of each party to the acquisition, preservation, appreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled his or her role.

Husband insists that because of his financial contribution to the acquisition of the Vincion Road property, this factor strongly supports his claim to a larger share of the marital estate. He asserts that he contributed at least $500,000 of his separate assets to the acquisition of the property, while Wife's own direct financial contribution was negligible or non-existent. He further insists that during the course of the marriage, he earned $1,056,422 from his job, or 85% of the total income earned by the parties during the marriage, while Wife's earnings of $180,904 amounted to only 15% and that she contributed only a minimal amount in income to the marriage.

Although the court is required to order an equitable division of marital property, it is well-established that an equitable division is not necessarily an equal division. *Larsen-Ball v. Ball*, 301 S.W.3d 228, 231 (Tenn. 2010); *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002); *Smith v. Smith*, 984 S.W.2d at 609. Husband argues that, conversely, an equal division is not necessarily an equitable division, and he urges this court to rule that in light of his contributions to the marriage, it would be most equitable to award him 85% of the marital assets.

Husband directs our attention to two cases involving marriages of long duration in which the greater financial contribution to the marital estate by one of the parties resulted in a correspondingly greater award of the marital assets to that party. However, both those cases can easily be distinguished on their facts from the present one. In *Larsen-Ball v. Ball*, 301 S.W.3d 228 (Tenn. 2010), the trial court awarded the husband sixty percent of an almost $30 million marital estate after an eighteen year marriage, and awarded the wife forty percent. This court affirmed that award.

Both parties appealed, and our Supreme Court agreed to hear that appeal.[5] The Court discussed the respective roles of the parties in the accumulation of the marital estate, noting that it was almost entirely derived from the husband's law practice, that the husband had a thriving law practice at the time the parties married, and that the wife had virtually no assets at that time. The Court found that the wife, a stay-at-home mother, was capable of earning at most $35,000 per year, but it agreed with the trial court's assessment that the wife's role as homemaker gave the husband the "liberty and opportunity to pursue and acquire this substantial estate." *Larsen-Ball v. Ball*, 301 S.W.3d at 235. The Court affirmed the division of the marital estate, because it simply found that such a division "would be well within [the

---

[5]The Supreme Court agreed to hear *Larsen-Ball v. Ball* for the purpose of deciding whether the trial court was correct to determine that a $17 million attorney fee received by the husband after the wife filed her complaint for divorce but before the final divorce hearing was conducted should be considered marital property rather than the husband's separate property. The Supreme Court affirmed, holding that a proper understanding of Tenn. Code Ann. § 36-4-121(b)(1)(A) requires that the fee be considered marital property.

trial court's] wide range of discretion in light of the multimillion dollar value of the marital property in this case." *Larsen-Ball v. Ball*, 301 S.W.3d at 236.

In the case of *McKee v. McKee*, No. M2009-01502-COA-R3-CV, 2010 WL 3245246 (Tenn. Ct. App. Aug. 17, 2010) (no Tenn. R. App. P. 11 application filed), the trial court granted the wife a divorce after a marriage of 26 years, and awarded her 75% of the marital assets upon a finding that her contribution to the acquisition and preservation of those assets far exceeded the husband's contribution. This court affirmed.

The wife in that case was a dentist whose education was funded solely by her parents. She had built up a valuable practice and she earned significantly more than her husband, who worked as a loan officer at a bank. She contributed her pre-marital savings to the purchase of the marital home, and thereafter used the income from her practice to pay the mortgage and the insurance, and to construct a substantial addition onto the home. The wife also used her own funds to purchase a vacation home, which the husband moved into after the parties separated. The wife continued to pay the mortgage and insurance on the property, while the husband paid the utility bills, mowed the lawn, and changed light bulbs.

Significantly, the wife testified that aside from being the primary wage-earner, she was also the homemaker and the primary caregiver for the parties' two children. She hired a nanny for the children, but she asserted that she did the cooking, cleaning, laundry and gardening as well as caring for the children when the nanny was not on duty. According to the wife's testimony, the husband turned down the opportunity to stay at home with the children when they were first born, and he had very little involvement in raising them after they got older. *McKee v. McKee*, 2010 WL 3245246 at *9. Thus, the evidence showed that the wife's contribution to the marital assets as both wage earner and homemaker was far greater than the husband's, thereby making it equitable for her to receive the far greater share of those assets.

In both *Larsen-Ball v. Ball* and *McKee v. McKee*, specific evidence was presented about the respective roles of the parties as homemakers or parents. In the present case, by contrast, there was virtually no evidence as to either party's involvement in the duties normally associated with homemaking or parenting. In the absence of such evidence, Husband urges us to base our judgment solely upon the fact that his financial contribution to the marriage was greater than Wife's.

Despite the paucity of the evidence, someone must have performed the homemaking and parenting functions. There were some indications in the record that the parties held different attitudes about the non-financial aspects of their marriage, from which the court may have inferred that Wife's contributions in those areas equaled or balanced Husband's

financial contributions. As we noted above, the parties maintained separate checking accounts during the marriage. Husband used his account for house, utility, tax and insurance payments. Wife used hers for food, clothing, medical care and the needs of the children. Wife responded to a question at trial about a conversation with Husband in which he explained his approach to marital finances:

A. At the end of our marriage, right before we separated, he told me that our finances had always been by his design and that he designed it so that he paid for the things that were important and the things that would reflect back onto the property, and that I spent my money on things that really didn't matter, and that I was too stupid to see it.

Q. Do you think your children didn't really matter?

A. I thought they mattered.

Q. That's where your money went, isn't it?

A. Yes.

Husband did not attempt to refute Wife's account of this conversation.

The trial court based its equal division of the marital estate "on the length of the marriage and the contributions that each party made during the course of the marriage." The evidence as to Wife's non-monetary contributions is admittedly thin, but in light of the entire record of this case, the evidence does not preponderate against the trial court's implied finding as to Wife's contribution to the acquisition, preservation and appreciation of the marital property. And even though the evidence may have also supported a slightly different result, an equal division of the marital assets remained within the range of discretion that the trial court was entitled to exercise in this case. *See Larsen-Ball v. Ball*, 301 S.W.3d at 236.

## C. Alimony

Our legislature has established a set of statutory factors to assist the courts in determining whether an award of alimony is appropriate, and if so, the nature, amount and manner of payment. Tenn. Code Ann. § 36-5-121(i). The factors are quite similar to those that the courts are directed to use when dividing marital property, except that, unlike in the division of marital property, they may consider the relative fault of the parties as a factor

when dealing with alimony.[6] As there were no findings of fault in this case, that factor is not relevant to our discussion.

Our courts have consistently summed up the legislative directive by stating that the most important factors to consider in determining spousal support are the needs of the disadvantaged spouse and the obligor spouse's ability to pay. *Anderton v. Anderton*, 988 S.W.2d 675, 683 (Tenn. Ct. App. 1998); *Varley v. Varley*, 934 S.W.2d 659, 668 (Tenn. Ct. App. 1996); *Lancaster v. Lancaster*, 671 S.W.2d 501, 503 (Tenn. Ct. App. 1984). Husband argues that these two factors weigh heavily in favor of an award of alimony award to him, and he argues that under the circumstances, the court should have ordered Wife to pay him $500 per month as alimony in futuro.

An award of alimony is within the discretion of the trial court in view of the particular circumstances of each case. *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *Houghland v. Houghland*, 844 S.W.2d 619, 621 (Tenn. Ct. App. 1992). The appellate courts are reluctant to second guess a trial court's support decision and will do so only when the decision is not supported by the evidence or is contrary to the spousal support statutes. *Ingram v. Ingram*, 721 S.W.2d 262, 264 (Tenn. Ct. App. 1986); *Lancaster v. Lancaster*, 671

---

[6]The statutory factors for an award of alimony are,

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
(3) The duration of the marriage;
(4) The age and mental condition of each party;
(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
(7) The separate assets of each party, both real and personal, tangible and intangible;
(8) The provisions made with regard to the marital property, as defined in §
(9) The standard of living of the parties established during the marriage;
(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and
(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties

Tenn.Code Ann. § 36-5-121(i).

S.W.2d 501, 502 (Tenn. Ct. App. 1984).

The trial court admitted Wife's monthly pay stub for February 2010 into the record. The document shows gross income of $2,728.77, which includes compensation for 29.5 hours of overtime. Wife testified that her income was lower in the summer, when overtime was usually not available. Deductions from that amount included federal income tax, FICA, health and dental insurance, and totaled $816.38, leaving net income of $1,912.39. Wife's share of Husband's UPS pension from the property division amounts to about $1,013, increasing Wife's income to about $2,925. Wife's statement of recurring monthly expenses was also entered into the record. It includes $850 for rent and shows total expenses of $2,996, almost exactly matching her net income.

Husband's income is derived from two sources. His Social Security disability check amounts to $2,010 per month. His UPS pension is $3,040 per month. Subtracting Wife's share from his pension leaves $2,027, resulting in total net income of $4,037 per month for Husband, about $1,000 more than Wife receives. His statement of expenses, which includes a $625 entry for income tax, shows total monthly expenses of $3,857 per month, very close to the amount of his income.

Husband argues that despite the close matches between current income and current expenses for both parties, two expected developments will increase both Wife's ability to pay and his need for additional income. As we noted above, Wife testified that she was preparing to take a certification test at the time of trial, and that success on that test might result in a 9% pay increase for her. As Wife's attorney points out, however, it is not at all certain that Wife will be successful, and even if is, the additional income will not give her the ability to pay $500 per month in alimony.

Husband states that he was receiving his health insurance through Wife's employment at the time of trial, and that because of his medical condition, he will not be able to obtain private health insurance. Husband is, however, eligible to obtain COBRA insurance for an additional eighteen months by virtue of Wife's employment. The record contains a memorandum on state health insurance premiums, which indicates that Husband's cost for maintaining his same insurance under COBRA would be $774 per month. Husband testified that as an alternative, "if I go with Medicare, it is going to be around a thousand a month for my prescriptions and medical." Husband's expense statement recites prescription expenses of $650 per month, which includes his parenteral nutrition. It is unclear whether Husband included those expenses in his estimate of the cost of Medicare.

In any case, we do not dispute that as a result of divorce, Husband will have to pay additional medical insurance costs, and it seems highly likely that as a result his standard of

living will decline. We sympathize with Husband in this situation, for we are aware that he is continuing to endure a difficult medical challenge. "It is an unfortunate reality of divorce that two households are more expensive to maintain than one, and, therefore, it is not always possible for the ex-spouses to enjoy the same standard of living following a divorce as they did when they were married." *Anzalone v. Anzalone*, E2006-01885-COA-R3CV, 2007 WL 3171132 (Tenn. Ct. App. Oct. 30, 2007) (no Tenn. R. App. P. 11 application filed)(no Tenn. R. App. P. 11 application filed); *see also Williams v. Williams*, E2000-02782-COA-R3-CV, 2001 WL 766994 (Tenn. Ct. App. July 10, 2001) (no Tenn. R. App. P. 11 application filed); *Hausmann v. Hausmann*, 01A-01-9702-CH-00092, 1997 WL 672649 (Tenn. Ct. App. Oct. 29, 1997).

Fortunately for Husband, the property division leaves him with an asset that can help him meet his needs. The trial court determined that the marital home is worth $575,000. If jklhit is sold, then each party would probably receive over $250,000 in cash, even after the costs of the sale are deducted. Husband's expense statement shows that he is not currently paying rent, and of course he will have to find another place to live if he sells the home. But his expense statement recites expenditures of $300 per month on lawn care, $362 in utility expenses (electric, water and propane), $226 in property taxes, and $91 in homeowners insurance. The elimination or reduction of those expenses should defray much, if not all, the costs of a rental.[7]

In sum, our analysis of Husband's needs and Wife's ability to pay show that the trial court did not abuse its discretion in declining to award alimony to either party. We accordingly affirm the judgment of the trial court

**IV.**

The judgment of the trial court is affirmed. We remand this case to the Chancery Court of Rutherford County for any further proceeding necessary. Tax the costs on appeal to the appellant, Richard Michael Schroer.

_____
PATRICIA J. COTTRELL, JUDGE

---

[7]Husband's expense statement also includes the cost of both Comcast and Direct TV, ADT Security, Car insurance of $275 per month, a Fairfield Glade property fee, and telephone expenses of $139 per month.