IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 10, 2019 Session

## KRISTEN PAULETTE STOKES v. STEVEN WADE STOKES

**Appeal from the Circuit Court for Davidson County**
**No. 15D-1236      Phillip R. Robinson, Judge**

_____

### No. M2018-00174-COA-R3-CV

_____

A mother and father each sought to be named the primary residential parent of their son, who was nine years old when the court granted the father a divorce. The trial court designated the father as the primary residential parent and granted the mother 146 days of residential parenting time with the child per year. The mother appealed, arguing that the court erred in conducting its comparative fitness analysis and in concluding that the father should be the primary residential parent. We affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and KENNY W. ARMSTRONG, J., joined.

Mark T. Freeman and Joseph W. Fuson, Nashville, Tennessee, for the appellant, Kristen Paulette Stokes.

Paula Ogle Blair, Nashville, Tennessee, for the appellee, Steven Wade Stokes.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

Kristen Paulette Stokes ("Mother") and Steven W. Stokes ("Father") were married for approximately twelve years when they separated in 2015. Their son, Noah, was born in January 2008. Father worked as a musician and played on tours as well as at local venues. He had some flexibility in his schedule and often worked in the evenings. Mother worked at a variety of jobs that included bartending, bar managing, interior design, teaching Zumba classes, and working as a personal trainer. Once Noah was born, Mother stopped working for a period of time and focused on being a stay-at-home mother.

In May of 2015, Mother moved out of the marital home. She moved into an apartment where a male friend, Larry Sterling, resided. Mother met Mr. Sterling around 2011 in an exercise class, and Mr. Sterling divorced his wife in 2013. Mr. Sterling stayed in Mother and Father's guest room when he needed a place to sleep during his divorce proceedings. Father asked Mother at various times whether she was romantically involved with Mr. Sterling, and Mother always responded "no." When Mother moved in with Mr. Sterling in 2015, she took Noah with her.

Mother filed a complaint for divorce in June 2015, asserting irreconcilable differences as grounds. She asked to be designated the primary residential parent and sought alimony. Father filed an answer and counter-complaint for divorce in June 2016, asserting irreconcilable differences and inappropriate marital conduct as grounds. Father alleged that Mother was engaged in a romantic relationship with Mr. Sterling and sought to be named the primary residential parent. Father also moved the court to enter an order prohibiting, restraining, and enjoining Mother from allowing Noah to be in the presence of Mr. Sterling or any of Mother's other alleged "paramours."

The trial court entered a temporary restraining order on June 16, 2016, granting Father the relief he requested. Following a show cause hearing, the court also found that it was in the child's best interest to remain in Father's primary care pending a final hearing. The court awarded Mother parenting time on the first, second, and third weekends of each month. Mother filed a motion to reconsider, and the court modified its earlier order by allowing Mother additional time with Noah each Thursday from the time school was dismissed until Friday at 6:00 p.m. If either parent was unable to care for Noah during their respective parenting time, the court ordered that the other parent had the right of first refusal before a babysitter could be considered.

The trial court heard this case over the course of five days starting on July 25 and ending on November 15, 2017. Mother and Father each filed a proposed parenting plan prior to trial in which they designated themselves as the primary residential parent. Mother testified on July 25 that she took several trips with Mr. Sterling after he divorced his wife and that they traveled to Gatlinburg, Disneyworld, and Colorado, sometimes with Noah and sometimes without Noah. Mother also testified that she accompanied Mr. Sterling to Jamaica for a wedding and that they went on a cruise together where they shared a cabin. Some of these trips took place before she moved out of the marital home. Mother maintained that on all of these trips her relationship with Mr. Sterling remained platonic.

Mr. Sterling's former wife testified that Mr. Sterling told her in October 2011, while they were still married, that he was in love with Mother. Contrary to Mother's testimony, Mr. Sterling acknowledged during his testimony on November 1, in response to pressure from the court to be completely honest, that his relationship with Mother became sexual in 2016. Mr. Sterling testified about a trip he took to Las Vegas with

Mother in 2013 or 2014, where they had a suite with adjoining rooms, and about a trip they took together to Arizona in 2016. Mr. Sterling initially denied having sexual relations with Mother on any of the trips they took together. The trial court grew impatient with Mr. Sterling, however, and it posed some questions of its own to him:

Q: Help me with this, is there more? I mean, I don't know that that exact question has been asked, but has there been more than kissing and fondling?

A: Yes, sir.

Q: Well, let's pull the scab off this, because I'll be honest, you-all are really stretching credibility here.

A: Yes, sir.

Q: And you understand you're sitting in a court of law under oath?

A: Yes, sir.

Q: If you knowingly tell me a falsehood, it's called aggravated perjury. It carries a minimum of a couple of years in the penitentiary. So, it's time to be real honest. What type of behavior have you-all engaged in?

A: We've had sexual intercourse in 2016.

Q: Okay. And in the past when you've been saying that you didn't, that was incorrect; is that correct?

A: Say that again, Your Honor.

Q: When you've been telling us that you haven't had sexual intercourse, you made a misstatement; is that correct?

A: Yes, Your Honor.

Mother was recalled to the witness stand on the final day of trial on November 15, 2017, and she was given the opportunity to correct her earlier testimony in which she had denied having a sexual relationship with Mr. Sterling. Mother acknowledged hearing Mr. Sterling testify that his relationship with her became sexual beginning in 2016. The trial court then interjected and questioned Mother about her earlier dishonesty:

THE COURT: Help me with this. Why did you sit up there and lie to me about it?

THE WITNESS: Well, sir, I know I misled you.

THE COURT: Let's not pitty pat around.

THE WITNESS: Okay.

THE COURT: You didn't [mis]lead me, you told a blatant lie under oath, a lie that you maintained throughout the entirety of these proceedings until just this moment. So, you tell me now --

THE WITNESS: Yes, sir.

THE COURT: -- why you lied to me.

THE WITNESS: Well, I don't want to split hairs, but I was not asked directly about my sexual relationship under direct testimony; however, I do acknowledge I did not tell you what I needed to tell you and I did not tell you when I should have told you. You told me that day, you said, Ms. Stokes, I'm not buying what you are shoveling. That was my moment that I should have told you what had happened in our relationship, and I did not. I fully regret it and take responsibility for that.

THE COURT: Did you ever get any written interrogatories asking you if you and Mr. Sterling had engaged in any type of sexual relations or sexual behavior?

THE WITNESS: Yes, sir. I had when I filled them out truthfully prior to.

THE COURT: But, you didn't supplement those when those things changed. Do you think at the time you filled them out if you told the truth then later on you could leave everybody under the mis-impression that nothing had occurred? Your attorneys didn't tell you you have to supplement and update those sorts of questions?

THE WITNESS: It wasn't until Mr. Freeman and Mr. Fuson came into my world that I knew things had to change and take a new direction.[1] I was not told that I had to supplement.

---

[1]Mother's initial trial attorney withdrew from the case after the first two days of trial and was replaced by Mark T. Freeman and Joseph W. Fuson.

THE COURT: Tell me when you started taking a new direction until a few seconds ago.

THE WITNESS: When Mr. Freeman and Mr. Fuson came into my life when Ms. Leininger decided to step down and withdraw. Well, the day -- actually it comes back to the day I testified. It did not sit well with me. I regretted it immediately not telling you the truth. I was --

THE COURT: But, that's the question that I've asked you, why didn't you tell me the truth? Why didn't you tell opposing Counsel the truth about amending your interrogatories? Why didn't you tell your husband the truth? Why didn't you tell this Court the truth, unless you thought the truth would be damaging to you and you would get some advantage by lying about it?

THE WITNESS: It was fear, sir. It was just fear.

THE COURT: Well, your attorneys these are real good lawyers, they wouldn't knowingly let you get up on this witness stand and tell a lie, and they will tell you what I told Mr. Sterling that the truth you can generally deal with, but a lie, there is no way you can justify it, because it means you're not a credible witness. This Court can't rely on any of your testimony, because you were willing to tell a false statement to me for your own benefit. So, everything that you've testified to, this Court can't attach any credibility to it.

The trial court took the case under advisement following the parties' close of proof. In an order dated December 28, 2017, the court awarded Father a divorce on the ground of inappropriate marital conduct and divided the marital assets between the parties. The court designated Father the primary residential parent and awarded Mother 146 days per year of residential time with Noah. The court ordered Mother to pay her own attorney's fees, $7,500 towards Father's attorney's fees, and $86 per month in child support. It declined to award spousal support to either party.

Mother filed a notice of appeal and raises just one issue on appeal. She argues that the trial court erred when it conducted its comparative fitness analysis and concluded that Father should be designated the primary residential parent, with Mother being awarded just 146 days of parenting time. Father contends Mother's appeal is frivolous and asks this Court for an award of the attorney's fees he has incurred on appeal.

## II. ANALYSIS

### A. Standard of Review

In non-jury cases such as this, we review the trial court's findings of fact de novo upon the record, according them a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We review questions of law de novo, attaching no presumption of correctness to the trial court's legal conclusions. *Armbrister*, 414 S.W.3d at 692; *Kendrick v. Shoemake*, 90 S.W.3d 566, 569 (Tenn. 2002).

This court has noted that "[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves" and that "[t]rial courts must be able to exercise broad discretion in these matters." *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). Our Supreme Court has addressed parenting plans and has described the role of appellate review as follows:

> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley*, 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Thus, determining the details of parenting plans is "'peculiarly within the broad discretion of the trial judge.'" *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge*, 42 S.W.3d at 88.

*Armbrister*, 414 S.W.3d at 693; *see also C.W.H. v. L.A.S.*, 538 S.W.3d 488, 495 (Tenn. 2017) (explaining that "trial courts are in a better position to observe the witnesses and assess their credibility; therefore, trial courts enjoy broad discretion in formulating parenting plans").

A trial court's decision will be affirmed under the abuse of discretion standard "'so long as reasonable minds can disagree as to propriety of the decision made.'" *Eldridge*, 42 S.W.3d at 85 (quoting *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000)). This standard of review does not permit an appellate court to substitute its judgment for that of the trial court when no error is apparent in the trial court's ruling. *C.W.H.*, 538 S.W.3d at 495; *Eldridge*, 42 S.W.3d. at 85, 88. As the *Eldridge* Court explained,

> The abuse of discretion standard recognizes that the trial court is in a better position than the appellate court to make certain judgments. The abuse of discretion standard does not require a trial court to render an ideal order, even in matters involving visitation, to withstand reversal. Reversal should not result simply because the appellate court found a "better" resolution.

*Eldridge*, 42 S.W.3d at 88; *see also C.W.H.*, 538 S.W.3d at 495.

### B. Comparative Fitness Analysis

When a trial court is faced with designating a primary residential parent during divorce proceedings, it must consider the child's best interest first and foremost. Tenn. Code Ann. § 36-6-106(a); *Armbrister*, 414 S.W.3d at 693. The court's designation is "'not intended to reward or to punish parents, and, in fact, *the interests of the parents are secondary to those of the children*.'" *Burden v. Burden*, 250 S.W.3d 899, 909 (Tenn. Ct. App. 2007) (quoting *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997)). The Legislature recognizes the "detrimental effect" divorce has on children and that, following a divorce, neither parent will have the same access to the children as he or she would have if the family had been able to remain intact. Tenn. Code Ann. § 36-6-401(a); *see generally Armbrister*, 414 S.W.3d at 693-96. To determine the child's best interest, the court "shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors." Tenn. Code Ann. § 36-6-106(a). The court is to consider "all relevant factors" set forth in the statute to the extent they are applicable. *Id.* Not all factors are relevant in every case, and there may be factors in some cases that are not included in the statute. *Rayburn v. Rayburn*, No. 01A01-9710-CH-00548, 1998 WL 721088, at *2 (Tenn. Ct. App. Oct. 16, 1998).

Once the trial court determines which parent should be designated the primary residential parent, the court is directed to establish a permanent parenting plan that, *inter*

*alia*, includes a residential schedule and details the authority and responsibilities of each parent with respect to the child. Tenn. Code Ann. § 36-6-404(a), (b). In determining the child's residential schedule, the court is to consider the factors set out Tenn. Code Ann. § 36-6-106(a). *Id.* at § 36-6-404(b); *see generally Armbrister*, 414 S.W.3d at 693-97.

The trial court in this case considered each of the statutory factors set forth in Tenn. Code Ann. § 36-6-106(a) and found that some factors favored Mother, others favored Father, some did not favor either parent, and some were not relevant:

> (1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

> The Court finds that each of the parents has a strong loving relationship with the parties' minor son. From the birth of the child until the separation of the parties in March, 2015, [Mother] has been the primary caregiver and by all accounts has done so successfully. However, [Father] was actively involved with the child during this time. Since June 16, 2016, [Father] has been the primary caregiver of the child although [Mother] has had frequent access to the child and has acted as a caregiver when [Father] was compelled to be out of town on business-related trips or was otherwise working. [Father] has also successfully parented the child during this period. Thus, each of the parties has, at various times, successfully performed the majority of parenting responsibilities relating to the daily needs of the child. However, considering that the Wife was the primary caregiver of the child from his birth until approximately eight years of age, this consideration favors [Mother].

> (2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

> In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court-ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

- 8 -

The Court finds that each parent's past behavior evidences that each party has the potential for the future performance of parenting responsibilities. Further, the Court finds that each of the parties will encourage a close and continuing parent-child relationship between the child and the other parent. The Court, however, has serious concerns regarding [Mother]'s judgment by moving into an apartment with her child and her male companion and subsequent paramour. Further, the Court was extremely disturbed by [Mother]'s harassing behavior toward [Father] when the Court placed possession of the child with him during the pendency of this action.[2] Finally, the Court is concerned by the Mother's behavior in exercising her right of first refusal when temporary possession of the child was placed with [Father]. In some of those instances, [Mother] refused to return the child as agreed or, once in possession of the child, attempted to modify the parties' agreement as to when the child would be returned. As noted, the Court also finds [Mother]'s refusal to commit to firm return dates to exchange the child is problematic. The Court finds this consideration to favor [Father].

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

This consideration is not applicable.

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

The Court finds that each of the parties is disposed to providing the minor child with adequate necessary care. However, the Court finds that [Father] is the higher earning parent and is better equipped to provide for the child. The Court finds this consideration to slightly favor [Father].

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

The Court finds that each of the parties has acted as the primary caregiver for the child and has done so successfully. The Mother has done

---

[2]Evidence was introduced that Mother began sending Father harassing text messages once the trial court placed temporary custody of Noah with Father in the summer of 2016 and that Mother refused at times to allow Father to speak with Noah when the child was with her. Mother acknowledged at trial that her harassing behavior had the effect of interfering with Father's parenting time with Noah.

so for a longer period of time than the Father. The evidence before the Court establishes that currently, the parties are generally cooperating and working well with one another. The Court finds this consideration slightly favors [Mother].

(6) The love, affection, and emotional ties existing between each parent and the child;

The Court finds that each of the parties has great love and affection for and emotional ties with the minor child. At one point during the pendency of this action, the Court finds the minor child was distraught as a result of his separation from his mother and the ongoing difficulties the parties were experiencing over the issue of custody. The Court finds that some of the child's issues with separation from [Mother] were generated by [Mother]'s emotional behavior when returning the child to [Father].[3] The child is currently in counseling in which both parents participate and his circumstances have improved. The Court finds this currently to be a neutral consideration.

(7) The emotional needs and developmental level of the child;

Except as set forth above, the Court has heard no evidence of any emotional needs or the developmental level of the child. The Court finds this consideration to be neutral.

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child;

The Court finds that neither party has any physical issue that interferes with their parenting the child. The Court does question [Mother]'s moral and emotional fitness to parent the child. The Court finds [Mother] has used exceedingly poor judgment in her decision to cohabitate with her male companion in the presence of the parties' child. The Court finds [Mother] misled [Father] as to the true nature of her relationship with her male companion and engaged in a romantic relationship with this individual in the presence of the child. During this time, she not only cohabitated with him in the child's presence but openly went on trips with him and, on occasion, took the child along. Further, this Court has concerns over [Mother]'s emotional fitness in light of her harassing and obsessive

---

[3]Father testified that Mother would cry and hold onto Noah when the parties met to transfer Noah from Mother to Father.

behavior during the pendency of this action. The evidence before the Court currently reflects that this behavior has ceased, and the parties are generally cooperating and co-parenting the child. However, [Mother]'s propensity to attempt to adjust the parties' agreement on the return time of the child when exercising her right of first refusal, as well as her emotional and prolonged good-byes when returning the child to [Father] cause this Court serious, concerns.[4] Considering all the foregoing, the Court finds this consideration favors [Father].

(9) The child's interaction and inter-relationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

The Court has heard nothing of the relationship between the minor child and the parties' relatives or the child's extracurricular activities. The child has no siblings. Each of the parties has, at some point, taken the child to their place of employment. While there was some testimony that the child enjoyed visiting the parents' place of employment, generally the Court finds this is not in the child's best interest. The Court notes that the child currently attends the Davidson County public school for which [Father] is zoned. [Mother] lives in Wilson County and by placing the child in the custody of [Mother], the Child would be forced to change schools, leaving classmates and current relationships behind. The Court finds this consideration to slightly favor [Father].

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

The Court finds that in each instance when the child was previously in the possession of [Mother] and currently while the child has been in the possession of [Father], the child has been well cared for by each of the parents. The child's living circumstance, while living with [Mother], and her male companion, was inappropriate. Currently, while the child has been in [Father]'s possession, [Father] has been compelled to travel or work in town and [Mother] has made herself available to act as a caregiver. The Court finds the parties are currently, for the most part, working well

---

[4]Father testified that when Mother exercised her right of first refusal during his parenting time, she often made it difficult for Father to have Noah returned to him, telling Father that Noah was busy doing some activity or that Father should let Noah stay with her because Noah was happy. Father also testified that Mother would bring a recently-acquired dog with her and Noah to the exchanges, with the result that Noah had to say goodbye to Mother in addition to saying goodbye to the dog, and that this process was emotionally taxing for Noah.

together for the benefit of their child such that he can spend time with each of the parents. As a result, the child is not required to spend extended time in daycare or with babysitters. The child currently attends a Davidson County school and were he to be placed in possession of [Mother], the child would be compelled to change schools. The Court finds that the child's current living arrangements in the marital residence appear to be satisfactory, especially in light of the parties' cooperation. The Court finds this continuity to be in the child's best interest. The Court finds that this consideration favors [Father].

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

The Court finds no evidence of any intentional physical abuse or emotional abuse to either party during the marriage or during the pendency of this divorce action except as noted herein regarding [Mother]'s excessive texting to [Father] regarding the issue of custody and access to the minor child which appear to have now been resolved. The Court does have concerns that [Mother]'s prolonged and/or emotional goodbyes during exchanges are detrimental to the minor child. The Court finds this consideration slightly favors the Father.

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

The Court finds that the only individual who resided in or frequented the home of either of the parties was [Mother]'s male companion. The Court's primary objection to [Mother]'s living arrangement with Mr. Sterling was [Mother]'s status as a married person during the pendency of the divorce action. The Court has subsequently found that she engaged in a romantic relationship with Mr. Sterling in the child's presence. The Court has heard no evidence of any behavior by Mr. Sterling that would make it inappropriate for him to be around the child once the parties are divorced. The Court finds this consideration does not apply upon the entry of the divorce decree.

(13) The reasonable preference of the child if twelve (12) years of age or older.

The Court finds this consideration is not applicable as the child is currently nine years of age and did not testify.

(14) Each parent's employment schedule and the court may make accommodations consistent with those schedules;

The Court finds that each of the parties has non-traditional and sometimes erratic schedules. More recently, during the pendency of this case, the parties have worked well with one another in providing care for the child while the other party was at work. The Court finds this consideration to be neutral.

(15) Any other factors deemed relevant by the court.

The Court finds that there are no other considerations other than those previously addressed.

Mother complains that the court erroneously denied her request to be designated the primary residential parent because of her infidelity, citing *Nelson v. Nelson*, 66 S.W.3d 896, 902 (Tenn. Ct. App. 2001), for support. Unlike Mother, however, the wife in *Nelson*, readily admitted to her extramarital affair. *Nelson*, 66 S.W.3d at 899. This case is more like *Rayburn v. Rayburn*, where the wife denied being engaged in an extramarital affair in the face of evidence suggesting otherwise. *Rayburn*, 1998 WL 721088, at *1. The *Rayburn* court noted that a trial court may consider a parent's "untruthfulness under oath in determining child custody" and that "'[a] parent's honesty reflects on his or her fitness to be a good custodian.'" *Id.* at *3 (quoting *Gaskill*, 936 S.W.2d at 634). The *Rayburn* court continued,

> A child learns as much by example as by precept, and it is up to the parent to set a good example. Ms. Rayburn (now Ms. Shearon) did not set a good example when she began an affair with a married man, and moved out of the marital home, taking the three children with her, and she did not set a good example when she rejected her husband's attempts at reconciliation. While, as this court said in *Varley v. Varley*, 934 S.W.2d 659, 666-7 (Tenn. App. 1996), "a parent's sexual infidelity or indiscretion does not, ipso facto, disqualify that parent from receiving custody of his/her children," such acts may be relevant to the question of character, and thus to comparative fitness.

*Id.*

In its order designating Father as the primary residential parent, the trial court found that Mother was not a credible witness:

> [T]he Court finds that the Wife is not a credible witness, and the Court discounts her testimony in its entirety. The Court finds that she has

- 13 -

shamefully lied to [Father] regarding the nature of her relationship with Mr. Sterling. She has induced [Father] to invite her male friend and subsequently her paramour into the parties' home, even allowing him to live there, as Mr. Sterling began his divorce from his own wife. The Wife's behavior was open and notorious, taking trips for business and pleasure with her male companion and subsequent paramour while [Father] stayed at home, working to pay her bills from her prior marriage and caring for the parties' minor child. She openly moved into an apartment and lived with Mr. Sterling with the parties' child. She lied to her naïve Husband both before and during this litigation and has repeatedly lied in court and in pleadings to this Court. She has alleged that her Husband was guilty of inappropriate marital conduct and suggested inappropriate relationships with his female friends without any credible evidence of such behavior. The Court finds [Father] guilty only of incredible naiveté and denial while he tried to ignore the obvious nature of his Wife's relationship with her male friend.

In addition to finding Mother was not credible, the trial court questioned Mother's judgment and her moral and emotional fitness to act as the primary residential parent based on evidence that Mother moved in with her paramour while she was still married and her decision to expose Noah to this other relationship. This finding by the court is supported by a text message from Mother to Father dated July 2, 2016, which was introduced into evidence during the trial. Mother was upset with Father during this period because the court had entered a restraining order precluding her from having Noah in the presence of Mr. Sterling. Mother told Father in this text that she had built a home for Noah where he was safe and where he felt loved by both Mother and Mr. Sterling.

Thus, contrary to Mother's argument, the court did not base its decision to designate Father as the primary residential parent solely on the fact that Mother had engaged in an extramarital affair. Rather, Mother's decision to expose Noah to her relationship with Mr. Sterling while she was still married to Father coupled with her dishonesty throughout the litigation, right up until the end of the trial, tipped the scales against Mother. The record shows that Father is a loving and devoted father to Noah and that he encourages Noah's relationship with Mother. Mother did not introduce any evidence suggesting any deficiencies in Father's parenting of Noah.

Our review of the record reveals that the evidence does not preponderate against the trial court's findings of fact with regard to its comparative fitness analysis. Mother has failed to show that the trial court abused its discretion in designating Father as the primary residential parent or in awarding the parties the residential parenting time set forth in the permanent parenting plan attached to the final decree of divorce. Mother requests that we tweak the residential parenting schedule to give her more time with Noah, but our Supreme Court has consistently written that determining the details of

parenting plans is a task for the trial judge absent an abuse of discretion. *See C.W.H.*, 538 S.W.3d at 495; *Armbrister*, 414 S.W.3d at 693; *Eldridge*, 42 S.W.3d at 88. We find no abuse of discretion, and accordingly, we affirm the trial court's judgment designating Father as the primary residential parent and awarding Mother 146 days of parenting time per year.

### C. Attorney's Fees

Father asserts that Mother's appeal was frivolous, and he seeks an award of the attorney's fees he incurred on appeal as damages. Tennessee Code Annotated section 27-1-122 addresses frivolous appeals and provides:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

"An appeal is frivolous when it has 'no reasonable chance of success' or is 'so utterly devoid of merit as to justify the imposition of a penalty.'" *Chiozza v. Chiozza*, 315 S.W.3d 482, 493 (Tenn. Ct. App. 2009) (quoting *Whalum v. Marshall*, 224 S.W.3d 169, 181 (Tenn. Ct. App. 2006)). A party's failure to provide an adequate record to the appellate court may be a basis for deeming an appeal frivolous. *Young v. Barrow*, 130 S.W.3d 59, 67 (Tenn. Ct. App. 2003) (citations omitted). In addition, a party's failure to point to any evidence or rule of law entitling him or her to relief may be a basis for a court to conclude an appeal is frivolous. *Jackson v. Aldridge*, 6 S.W.3d 501, 504 (Tenn. Ct. App. 1999) (citing *Wells v. Sentry Ins. Co.*, 834 S.W.2d 935, 938-39 (Tenn. 1992)).

Appellate courts have sole discretion to decide whether to award damages for the filing of a frivolous appeal, and we exercise that discretion sparingly to avoid discouraging legitimate appeals. *Chiozza*, 315 S.W.3d at 493. We decline to exercise our discretion in this case to award Father attorney's fees under the statute.

### III. CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, Kristen Paulette Stokes, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE